**UNITED STATES of America, Plaintiff,**

v.

**Eddie ANTAR, et al., Defendants.**

Crim. A. No. 92–347.

United States District Court,
D. New Jersey.

Dec. 9, 1993.

---

**294**

Michael Chertoff, U.S. Atty., Marc N. Garber, Jayne K. Blumberg, Asst. U.S. Attys., Newark, NJ, for U.S.

Richard P. O'Leary, McCarter & English, Newark, NJ, for Associated Press.

Donald A. Robinson, Robinson, St. John & Wayne, Newark, NJ, for Newark Morning Ledger Co.

Thomas J. Cafferty, Arlene M. Turinchak, McGimpsey & Cafferty, Somerset, NJ, for New Jersey Press Ass'n.

Jack Arseneault, David W. Fassett, Arseneault, Donohue, Sorrentino & Fassett, Chatham, NJ, for defendant Eddie Antar.

John R. Ford, Red Bank, NJ, for defendant Mitchell Antar.

Gerald Krovatin, Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, NJ, for defendant Allen Antar.

### ORDER UNSEALING TRANSCRIPT
### OF JURY VOIR DIRE

POLITAN, District Judge.

This MATTER having come before the Court upon the application of the Associated Press, the Newark Morning Ledger Company and the New Jersey Press Association to rescind the Order of this Court and unseal the transcript of the jury *voir dire* and make public the names and addresses of the *Antar* jurors, and the United States having appeared by its counsel (Michael Chertoff, United States Attorney for the District of New Jersey, and Jayne K. Blumberg, Assistant United States Attorney, appearing), and the Associated Press having appeared by its counsel (Richard P. O'Leary, Esq., appearing), and the Newark Morning Ledger Company having appeared by its counsel (Donald A. Robinson, Esq., appearing), and the New Jersey Press Association having appeared by its counsel (Thomas J. Cafferty, Esq., appearing), and the Court having considered the written submissions and arguments of counsel, and good cause having been shown, the Court hereby makes the following findings for the reasons more fully explained in the accompanying Letter Opinion dated December 9, 1993:

1. The Associated Press, the Newark Morning Ledger Company, and the New Jersey Press Association (collectively, the "Press"), seek the names and addresses of the jurors, at least in part, for the purpose of questioning the jurors about their internal deliberations.

2. There exists a First Amendment right of access to the *voir dire* transcript wherein the jurors reveal their names and places of residence.

3. However, equally existent is a compelling governmental and/or societal interest in promoting and maintaining the secrecy of the jury deliberative process and the privacy of jurors. Providing unfettered access to the press and to the public in general is contrary to this interest and presents a substantial threat to the administration of justice by endangering the deliberative process.

4. Accordingly, in seeking to accommodate these competing interests,

IT IS on this 9th day of December, 1993, hereby ORDERED that:

1. The transcript of the jury *voir dire* be and hereby is unsealed and made available for public inspection as of Monday, December 13, 1993.

2. Any person who comes into possession of the transcript of the jury *voir dire* and the juror identifying information contained therein is subject to certain limitations regarding the manner in which post-verdict juror interviews are conducted in order to protect the jurors' privacy and to promote the interest of maintaining the secrecy of the jury deliberative process, which limitations are set forth as follows:

(a) no juror is under any obligation to grant an interview nor may any juror be compelled to do so;

(b) repeated requests of a juror for an interview by any person or any associate of that person are strictly prohibited;

(c) once a juror expresses a desire to conclude an interview already in progress, the interviewer must immediately cease all questioning;

(d) no inquiry may be made into the specific votes, statements, opinions or other comments of any juror during deliberations other than the juror being interviewed.

3. A copy of this Order shall be distributed to petitioners by their respective counsel.

4. A copy of this Order shall be distributed with the transcript of the *voir dire* to all persons who request a copy of the transcript.

5. Any person who violates any provision of this Order may be held in contempt or otherwise sanctioned by this Court.

6. This Order shall take effect upon filing and, for good cause shown and on written notice, counsel for the United States or for the parties identified above may move this Court for the modification of its terms and conditions.

**SO ORDERED:**

ATTACHMENT

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

CHAMBERS OF

NICHOLAS H. POLITAN

JUDGE

*FOR PUBLICATION*

December 9, 1993

***LETTER OPINION***

***ORIGINAL ON FILE WITH CLERK OF THE COURT***

Michael Chertoff, U.S. Attorney

Marc N. Garber, Assistant U.S. Attorney

Jayne K. Blumberg, Assistant U.S. Attorney

970 Broad Street

Room 502

Newark, NJ 07102

Attorneys for United States

Richard P. O'Leary, Esq.

McCarter & English

Four Gateway Center

100 Mulberry Street

PO Box 652

Newark, NJ 07101–0652

Attorneys for Associated Press

Donald A. Robinson, Esq.

Robinson, St. John & Wayne

Two Penn Plaza East

Newark, NJ 07105–2249

Attorneys for Newark Morning Ledger Co.

Thomas J. Cafferty, Esq.

Arlene M. Turinchak, Esq.

McGimpsey & Cafferty

285 Davidson Avenue

Somerset, NJ 08873

Attorneys for New Jersey Press Association

Jack Arseneault, Esq.

David W. Fassett, Esq.

Arseneault, Donohue, Sorrentino & Fassett

560 Main Street

Chatham, NJ 07928–2119

Attorneys for Defendant Eddie Antar

John R. Ford, Esq.

212 Maple Avenue PO Box 578

Red Bank, NJ 07701

Attorney for Defendant Mitchell Antar

Gerald Krovatin, Esq.

Lowenstein, Sandler, Kohl, Fisher & Boylan

65 Livingston Avenue

Roseland, NJ 07068

Attorneys for Defendant Allen Antar

Re: United States of America

v. Eddie Antar, et al

*Criminal Action No. 92–347 (NHP)*

Dear Counsel:

In the instant motion, various members of the press, cloaked in robes bearing the sign "First Amendment," request the Court to release the names and addresses of the jurors who served in the trial of *United States v. Eddie Antar, et al.* Stripped of all its sanctimonious rhetoric, however, this application by the press is merely an attempt to convert the orderly constitutional process of a trial by jury and all its safeguards and securities into trial by press—but only in cases that are sensational and high profiled. Indeed, were this a routine civil litigation or a run-of-the-mill criminal drug case, the press clearly would not be interested in the names of jurors nor the internal deliberations of the jury.

It is naive to blindly acknowledge or adopt the unfettered First Amendment free-

doms espoused by the press to support its assertion of a right to invade the secret deliberations in the jury room. The fact is, and courts should candidly recognize it, that the invasion of the jury system by the press is only, and I repeat only, designed to sell newspapers.

At the outset, it should be noted what this case is NOT about. It is not about, as classified by counsel for the press at the hearing on its application, the return to a "Star Chamber." It is not about the inability of the press to obtain full access to the entire public proceeding. It is not about the right of the press to sensationalize and on·occasion to cause a disruption in a trial by its reporting. It is not about censoring the press. It is not about impeding, in any way, shape, manner or form, the public's right to know and the press' right to comment upon any aspect of a public trial. On the contrary, it is about the right of the defendant in any case to have jurors free to discuss frankly and openly the case with fellow jurors during the deliberations. It is about the right of the jurors to be assured that their frank, candid and sincere discussions will not be open to public debate, ridicule or condemnation as a result of the publication of their comments and opinions in any form by the press. Indeed, logic dictates that such publication would have a chilling effect upon the free flow of juror deliberations and could cause a juror or jurors to refrain from taking a position—albeit unpopular or otherwise—for fear of the public scorn or criticism which might follow from exposure of the jury's deliberative process. It is about the preservation of the very precious right of a trial by jury unencumbered by any extraneous force save the judge's instructions on the law.

Having set forth the issue in its proper context, I turn to the facts which gave rise to the instant motion.

### BACKGROUND

On June 1, 1993, jury selection in the criminal trial of *United States v. Eddie An-* *tar, et al,* 839 F.Supp. 293, commenced. The events preceding the trial of Eddie Antar, Mitchell Antar and Allen Antar were widely publicized by the media. Eddie Antar founded the now defunct consumer electronics company known as Crazy Eddie. The company was best known for its raucous television commercials in which the Crazy Eddie pitchman proclaimed in a loud, shrill voice that Crazy Eddie's prices were "INSANE." The Crazy Eddie chain of 43 stores collapsed in late 1989 amid allegations that Eddie Antar among others had carried out one of the "most celebrated stock scandals in U.S. history" in which investors were bilked of tens of millions of dollars. *See* Robert Rudolph, *Behind Bars: Antar Ordered Held Without Bail,* **Star–Ledger (Newark),** Jan. 12, 1993. In early 1990, Eddie Antar fled the United States after this Court ordered him to repatriate $73 million to the United States Government as a result of civil stock fraud charges brought by the Securities and Exchange Commission. The criminal indictment followed. After a two-year international manhunt for Antar, spearheaded by United States Marshal Arthur Borinsky, Antar was located in Israel and eventually extradited to the United States in January 1993 to stand trial on the criminal indictment. *See* Robert Rudolph, *Fugitive "Crazy Eddie" Captured in Israel,* **Star–Ledger (Newark),** June 25, 1992, at 1.

As a result of the wide coverage of these events and the expected length of the trial, the Court requested a jury pool of 150 potential jurors. Because of the large number of potential jurors, there was a shortage of seating in the courtroom. Consequently, the Court requested that the representatives of the media wait outside the courtroom. The members of the· media voluntarily complied with that request. During the following two days of *voir dire* and the remainder of the trial, the courtroom was open to the public.[1]

**1.** The courtroom was closed on June 17, 1993. On that morning, counsel for defendant Eddie Antar informed the Court that Mr. Antar's daughter had died and funeral services were going to be held that afternoon. Counsel for Mr. Antar requested the Court to allow Mr. Antar to attend the funeral. Out of common human decency and respect for the family and in appreciation of their

On July 14, 1993, the Associated Press (the "AP"), through its attorney, wrote a letter to the Court "informally" requesting that the names and addresses of the *Antar* jurors be disclosed. Because members of the media were requested to wait outside of the courtroom during the first day of *voir dire* and because the *voir dire* transcript had not been transcribed as of that date, the press did not have an independent means of obtaining the information. The AP thus requested assistance from the Court in obtaining the names and addresses of the jurors. The letter stated in pertinent part:

The AP's interest in the names and addresses of the jurors is obvious—it would like to write a story after the verdict and would like to interview the jurors for that story. To protect any concern your Honor may have about communicating with the jurors before a verdict is rendered, I would suggest that your honor disclose the names and addresses of the jurors to me. As an officer of the court, I represent that I would not disclose this information to the AP until after the verdict has been returned.

If I may suggest, rather than impose upon the jurors at their homes, and to minimize any intrusion in their lives, I respectfully request that the Court provide a room where the jurors and reporters may speak after the jury is excused. U.S. District Judge Avern Cohn suggested the solution several years ago in a highly publicized case, and it worked to protect the jurors from inconvenience and disturbance and to diffuse public interest in the jurors.

Letter from Richard P. O'Leary, McCarter & English (July 14, 1993).

The letter was received on the day before the case was sent to the jury. The avowed intention of the press to interview the jurors caused immediate concern to the Court by raising the possibility that the jurors might be exposed to outside influences prior to rendering their verdicts. Following a six week trial in a highly publicized case, the Court found it necessary to exercise its broad discretion in supervising the fair administration of justice and took steps to eliminate the possibility that any outside influence would come to bear upon the *Antar* jurors during their deliberations. On July 16, 1993, the Court ordered the sealing of the *voir dire* examination of the jurors, those portions of the transcript which identified the name of the jury foreperson, and all portions of the record in the case that would disclose the names and/or addresses of the jury. *See* Transcript of Proceedings, 21.22–23.

On July 20, 1993, after deliberating for a period extending over six days, the jury convicted Eddie Antar on all counts, acquitted Allen Antar on all counts, and acquitted Mitchell Antar on two securities fraud counts and convicted him on the remaining six counts. The Court polled each juror in open court by his or her last name on each of the counts against each defendant. The members of the press were present during the reading of the verdicts and the polling of the jurors. The jury was not discharged after rendering the verdict but was ordered to return to the court on August 4, 1993, to decide the forfeiture allegations.

On July 29, 1993, the AP moved formally, by way of Order to Show Cause, seeking the release of the names and addresses of the *Antar* jurors and requesting that the Court disclose the information prior to the Court's discharge of the jurors following the forfeiture hearing. In its submissions in support of its application, the AP stated that it wished to obtain the jurors' names and addresses to search out and examine the jurors about the trial. *See* Affidavit of Jeanne Lahiff, dated July 29, 1993 at ¶ 10 ("After the forfeiture hearing is completed and the jury is discharged, the AP would like to interview the jurors. Consequently, it is imperative

---

grief, the Court closed the courtroom to everyone except the Government, the defendants, and their families during the hearing on Mr. Antar's application. The Court has subsequently unsealed that transcript. In addition, the Court has unsealed the transcripts relating to various *in cam-*

*era* proceedings that occurred during the trial and subsequent to the rendering of the verdict. The only information sought by the press that now remains sealed is the transcript of the *voir dire.*

that the jurors' names and addresses be released to the AP by August 4, 1993.").

On August 2, 1993, the representatives of the AP and the parties appeared before the Court. On that day the United States Attorney for the District of New Jersey advised the Court that the United States Government was dismissing the forfeiture action against the two remaining defendants. The Court thereafter discharged the jury by calling each juror individually and by writing each juror a letter wherein the Court thanked the juror for his/her service and notified him/her that there was no need to return to court for further deliberations on the forfeiture allegations. On that same day, the Court reiterated its reasons for impounding the jurors' names and addresses and sealing the *voir dire* transcript:

> I sealed it all because I wasn't going to have my ruling subverted, hopefully. I sealed everything. I sealed the *voir dire*. I sealed everything.
>
> There is no gag order except to the extent that it applies to giving the names and addresses of jurors. Whatever you folks do, you do. I'm not going to stop you. The purpose of my gag order was very simple. It was to get back to the very basic fundamental issue of having a fair and impartial jury not affected by any outside influences, including the outside-of-the-court statements made by counsel either for the government or for the defense.

*See* Transcript of Proceedings, August 2, 1993, at 42. After hearing arguments from counsel for the AP, the United States Attorney and counsel for the defendants, the Court set a briefing schedule and made the Order to Show Cause returnable on August 23, 1993.

2. Hereinafter the Court will refer to the petitioners collectively as "the press" or "the media."

3. The Court makes clear that defendant Eddie Antar knew the identities of the jurors from the very start of the trial and never raised an objection concerning the absence of the press from the courtroom on that first day of *voir dire*. Because the Court ultimately releases the transcripts based upon the press' First Amendment right of access, the Court need not comment on Mr. Antar's position.

On August 19, 1993, the AP voluntarily withdrew its application. Accordingly, the Court removed the application from its calendar. The next day, however, the AP reversed itself and informed the Court that it wished to reinstate the application. On August 23, 1993, the original return date for the Order to Show Cause, the AP appeared before the Court and clarified its request concerning the *Antar* jurors: (1) to unseal the transcript of the jury *voir dire*; (2) to rescind the Court's impoundment of the first names and addresses of the *Antar* jurors; (3) to unseal the transcript of the Court's August 23, 1993 chambers communications with the United States and counsel for Eddie and Mitchell Antar; and (4) to unseal the transcript of the proceedings held before the Court on June 17, 1993. Without ruling on the merits of the application, the Court expressed its concerns about granting the AP such unrestricted access to the jurors.

Sometime after the hearing on August 23, 1993, the Newark Morning Ledger Company, (the "Star–Ledger") and the New Jersey Press Association informed the Court of their intent to move to intervene in this matter.[2] By letter dated August 26, 1993, counsel for Eddie Antar notified the Court of the defendant's position that the Sixth Amendment right to a public trial mandates the disclosure of all sealed transcripts.[3] With the consent of all of the parties, the hearing was eventually set down for October 18, 1993.

### DISCUSSION

#### A. The Right of Access Analysis

The members of the media have steadfastly contended that the public has a right to know the identity of the jurors who decided the fate of the Antars.[4] The Court does not

4. The press has raised three separate grounds in support of its application. The press contends that the Court's sealing Order violates: (1) The Jury Selection and Service Act of 1968, 28 U.S.C. § 1861, et seq. and the local rules promulgated thereunder; (2) the First Amendment; and (3) the federal common law right of access.

In the usual case, Section J of this court's Implementation Plan of the Jury Selection and Service Act requires that the names of jurors be made available to the parties and to the public

disagree with this position, in and of itself. In fact, the Court reiterates that the entire trial was open to the public and that the only reason the press was asked to leave the courtroom on the first day of *voir dire* was due to the logistical problem regarding the availability of seats. The trial continued for nearly six weeks and at no time during that time were any requests made to the Court regarding the names and addresses of the jurors, nor was the *voir dire* sealed, nor were any extraordinary steps taken by the Court to conceal the names and addresses of the jurors. It was only after the AP's July 14, 1993 letter was received that the Court had any reason to be concerned about the jurors. The letter made it perfectly clear that the press had every intention of contacting the *Antar* jurors. The letter's arrival, just prior to the start of deliberations, moved the Court to seal the *voir dire* wherein the jurors identified themselves and the towns in which they lived. In the Court's judgment, sealing the *voir dire* was necessary at the time to preclude any possibility of contact by the media during the deliberations.

■ Whenever a court seals the names and addresses of jurors a collision among various constitutional guarantees occurs. By precluding the public and, in particular, the press, from access to the names and addresses of the jurors, the press' First Amendment right of access to criminal trials is implicated.

*See Press–Enterprise Co. v. Superior Court,* 478 U.S. 1, 8–9, 106 S.Ct. 2735, 2740–41, 92 L.Ed.2d 1 (1986) (*"Press–Enterprise II"*). The disclosure or nondisclosure of such information also implicates a defendant's Sixth Amendment and Fourteenth Amendment Due Process right to an open trial. *Sheppard v. Maxwell,* 384 U.S. 333, 362–63, 86 S.Ct. 1507, 1522–23, 16 L.Ed.2d 600 (1966); *In re Globe Newspaper Co.,* 729 F.2d 47, 52–53 (1st Cir.1984). Finally, the privacy interests of the jurors in the information revealed during *voir dire* are implicated by such disclosure. *See Press–Enterprise Co. v. Superior Court,* 464 U.S. 501, 510–13, 104 S.Ct. 819, 824–26, 78 L.Ed.2d 629 (1984) (*"Press–Enterprise I"*).

Although the Supreme Court has yet to address the specific right of public access issue presented in this case, the Court has established a framework by which to analyze such public access issues under the First Amendment. In *Press–Enterprise II,* the Supreme Court recognized that two complementary considerations are emphasized in each of its prior cases discussing the issue of public access: (1) "whether the place and process have historically been open to the press and general public;" and (2) "whether public access plays a significant positive role in the functioning of the particular process in question." *Press–Enterprise II,* 478 U.S. at 8, 106 S.Ct. at 2740. Where the particular proceeding at issue "passes these tests of

within ten days after they are summoned for service. Under the All Writs Act, 28 U.S.C. § 1651, however, the trial judge has the inherent authority to take whatever steps are necessary to the administration of justice. In this regard, I note that upon the empanelment of the jury, the Court took no steps to conceal the identity of the jurors from the public. Indeed, all who were present in the courtroom during the *voir dire* were told the identity of the jurors. The Court took the precautionary step of sealing the names and addresses of the jurors only in direct response to what it perceived as a real threat to the otherwise untainted jurors just prior to the commencement of deliberations. The Court holds that pursuant to the authority granted to the Court under the All Writs Act such action was necessary at the time to ensure that the jurors remained fair, impartial, and free from any outside influences.

The press contends that the sealing of the *voir dire* violates both the First Amendment's right of

access to all phases of a criminal trial and the First Amendment's proscription against prior restraints. At this point in the proceeding the press seeks to gather news. The press' primary argument is that this Court has effectively precluded the press from obtaining such information. Thus, this Court's Order does not prevent the press from publishing information the press has already obtained, but merely stands as a roadblock to the press in obtaining the information. *See Pell v. Procunier,* 417 U.S. 817, 834–835 & n. 9, 94 S.Ct. 2800, 2810–11 & n. 9, 41 L.Ed.2d 495 (1974). Accordingly, the Court will employ the Supreme Court's framework for addressing right of access issues in resolving the pending dispute.

Finally, because the Court ultimately unseals the *voir dire* transcript under the First Amendment analysis, the Court will decline to make a finding under the concept of a federal common law right of access.

experience and logic, a qualified First Amendment right of public access attaches." *Id.* at 9, 106 S.Ct. at 2740. The qualified right may be overcome, however, "by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.* (quoting *Press–Enterprise I,* 464 U.S. at 510, 104 S.Ct. at 824).

This Court acknowledges that historically the identity of jurors sitting in criminal trials has been open to the public and essentially known to all who attended the trials. As the Supreme Court in *Press–Enterprise I* noted, the roots of open trials date back to the days before the Norman Conquest where attendance was virtually compulsory on the part of the freemen in the community. Although the requirement of compulsory attendance was relaxed by the 15th and 16th Centuries, the accounts of jury selection during that period similarly relay the public nature of jury selection where trials took place in "'towne house[s]'" or some other "'open or common place.'" *Press–Enterprise I,* 464 U.S. at 506, 104 S.Ct. at 822 (citing T. Smith, De Republica Anglorum 96 (Alston ed. 1906)). These open proceedings carried over to colonial America where the jury system grew up with juries of the vicinage. *In re Baltimore Sun Co.,* 841 F.2d 74, 75 (4th Cir.1988) (citing Jack Pope, *The Jury,* 39 Tex.L.Rev. 426 (1961)); *see also Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 569, 100 S.Ct. 2814, 2823, 65 L.Ed.2d 973 (1980); Robert Lloyd Raskopf, *A First Amendment Right of Access to a Juror's Identity: Toward a Fuller Understanding of the Jury's Deliberative Process,* 17 Pepp.L.Rev. 357 (1990) [hereinafter "Raskopf"]. In those times, as undoubtedly is the case in many rural communities today, everybody knew everybody on the jury as well as everyone stricken from the venire list. *In re Baltimore Sun,* 841 F.2d at 75.

The demographics of the modern times, however, characterized by anonymity of life in the cities and suburbs, has given rise to the situation where in the large majority of trials held in this courthouse as well as most other courthouses around the nation, jurors are not known to all. The only way most members of the public today can learn the identity of jurors is by examining the jury list maintained by the Clerk of the Court or by listening to the *voir dire* of the jurors during which each juror is asked to identify him or herself. Because the average citizen does not have the time to attend trials, it has become the function of the press to disseminate information about such trials to the public.

The value in maintaining this historic openness in criminal trials through providing the press and the public access to all the phases of the criminal trial:

> lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known. Openness thus enhances both the basic fairness of the criminal trial and appearance of fairness so essential to public confidence in the system.

*Press–Enterprise I,* 464 U.S. at 508, 104 S.Ct. at 823 (emphasis supplied) (citing *Richmond Newspapers, Inc., v. Virginia,* 448 U.S. at 569–571, 100 S.Ct. at 2823–24). Disclosing the identities of the jurors allows the public to verify the impartiality of the persons who ultimately decide the fate of the criminal defendant. Such disclosure "ensures fairness, the appearance of fairness and public confidence in [the jury] system." *In re Globe Newspaper Company,* 920 F.2d 88, 94 (1st Cir.1990); *see also United States v. Raffoul,* 826 F.2d 218, 224 (3d Cir.1987). Thus, there is a strong argument to be made that disclosure plays a significant positive role in the functioning of the jury system.

Unfortunately, with the identification of juror names and addresses, however, is the fairly recent trend of interviewing jurors post-verdict concerning the internal deliberations of the jury.[5] In the opinion of this Court, this modern day phenomenon of post-

---

5. *See generally* Note, *Public Disclosures of Jury Deliberations,* 96 Harv.L.Rev. 886 (1983) (recognizing that post-verdict interviews of jurors are "more widespread than ever before").

verdict juror interviews bodes ill for the continued vitality and authoritativeness of the jury system. I note that I do not stand alone as far as this fear is concerned.[6]

This Court has no doubt that the impetus behind the press' desire to obtain the names and addresses of the jurors is the goal of penetrating the sanctity of the jury room and publishing as much information as it obtains regarding the internal deliberations of the jury. Counsel for the AP conceded as much at the hearing before the Court on August 23, 1993:

> COURT: They [members of the press] want to know what they [the jurors] did in the room over there, Mr. O'Leary. Come on. That is what you want to know. That is what the press wants to know. That is what we'll face when the motion comes.
> MR. O'LEARY: Yes, your Honor.

Transcript of Proceedings, August 23, 1993, at 7. The Court need not rest upon the representations of counsel, however, to reach this conclusion. Stories regarding the painstaking, emotional and traumatic process by which juries reach verdicts in high profile cases are what sell newspapers and air time. Such is a truism repeatedly exemplified by the post-verdict interviewing of jurors in high profile trials across the nation.[7] Thus, a true appreciation for the issue now before the Court cannot be had without recognizing that the real question is whether the press has a right of access to information regarding the internal deliberations of the jury.

This current day trend of invading, sensationalizing, and exploiting the sanctity of jury deliberations "is grossly at odds with the jury's history and function." Goldstein, *supra*, at 296–97. Courts have repeatedly recognized that secrecy in jury deliberations is integral to the jury process. The Supreme Court observed in *Clark v. United States* that the need for secrecy of jury deliberations is fundamental to the tradition of justice:

> Freedom of debate might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world. The force of these considerations is not to be gainsaid.

*Clark v. United States*, 289 U.S. 1, 12–13, 53 S.Ct. 465, 468–69, 77 L.Ed. 993 (1933); *see also United States v. Allen*, 736 F.Supp. 914, 916 (N.D.Ill.1990) ("the privileged and secret nature of grand and petit juries has been recognized back to the 17th century and was imported into our federal common law"), *aff'd*, 962 F.2d 660 (7th Cir.), *cert. de-*

---

**6.** In *United States v. Doherty*, 675 F.Supp. 719 (D.Mass.1987), *aff'd in part, rev'd on other grounds*, 867 F.2d 47 (1st Cir.1989), the trial judge stated that:

> For one juror to make public the thoughts and deliberations of his colleagues in the deliberation room will 'chill' the free flowing process that our system encourages ... especially if other jurors come to believe that it is accepted practice for jury deliberations to be freely discussed once the verdict is returned.

675 F.Supp. at 724; *Cf. United States v. Franklin*, 546 F.Supp. 1133 (N.D.In.1982) (citing multiple cases wherein judges have expressed concerns over post-verdict interrogations of jurors); *see generally* Abraham S. Goldstein, *Jury Secrecy and the Media: The Problem of Postverdict Interviews*, 1993 U.Ill.L.Rev. 295, 296–97 (1993) [hereinafter "Goldstein"].

**7.** *See* Dan Morain and Edward J. Boyer, *Lungren Calls Verdicts "Body Blow" to Justice; Attorney General Says He Fears that Acquittals will Send a Message Condoning Violence. Meanwhile, Jurors Continue to Argue About What Took Place During Deliberations*, **L.A. Times**, Oct. 27, 1993, at B1

(Reginald Denny Trial); *Denny Trial Forewoman: Jury Followed Law, Not Fears*, **Chi. Trib.**, Oct. 26, 1993, at N18 (Reginald Denny trial); Jesse Katz, *Participants in King Case Try to Cash In*, **L.A. Times**, Apr. 25, 1993, at A1; Shirley E. Perlman, *Inside the Jury Room; Consensus from Start: No "Guiltys"*, **Newsday**, Dec. 13, 1991, at 7 (William Kennedy Smith trial); Ted Rohrlich, *Tempers Flared, Emotions Ran High for King Jury; Jurors Describe Weeklong Deliberations, Including Explosive Argument that Provided a Cartharsis*, **L.A. Times**, Apr. 23, 1993, at A1 (Rodney King civil rights trial); *Tyson Trial Juror has Second Thoughts*, **United Press International**, Jan. 11, 1993 (Mike Tyson trial); *Two Jurors Say They Didn't Believe Tyson*, **L.A. Times**, Mar. 10, 1992, at C3 (Mike Tyson trial); *2 Jurors Assert that Pressure Forced Them to Alter Their Votes*, **N.Y. Times**, June 23, 1982, at B6 (John Hinckely, Jr. trial); CNN, *Larry King Live*, Transcript # 949–1 (Oct. 26, 1993) (interview with alternate juror in Denny case); *see also* Raskopf, *supra*, at 370, n. 100 (citing newspaper articles in which jurors from the John Gotti trial, the Jean Harris trial, the Howard Beach trial and other trials of local notoriety have given interviews regarding the internal deliberations of the jury).

*nied,* —— U.S. ——, 113 S.Ct. 262, 121 L.Ed.2d 192 (1992); *accord In re Globe Newspaper,* 920 F.2d at 94 ("Clearly, there is *no* ordinary public right to 'know' what occurs in the jury room"); *Doherty,* 675 F.Supp. at 722 ("It is beyond peradventure that the actual deliberations of a jury are private and confidential and not subject to public access"). In fact, the Court notes that in none of the support marshalled by the AP, the Star–Ledger, the New Jersey Press, and defendant Eddie Antar, is it ever suggested that the purpose of requiring public access to all stages of criminal trials, including the identification of jurors in *voir dire,* is to provide public access to what took place in the jury room.

A cursory review of the practices employed daily in courtrooms throughout the United States also reinforces the age-old idea, virtually taken for granted, that what goes on in the jury room should stay in the jury room. *See generally* Goldstein, *supra,* at 297–98. For instance, judges routinely instruct jurors not to speak to anyone about a case prior to retiring for deliberations and once deliberations commence to talk only to fellow jurors. Court Security Officers are posted outside of jury rooms to guard against intrusions. Where the risks of intrusion are determined to be high, juries are sequestered. *See In re Baltimore Sun,* 841 F.2d at 76.

Rules of procedure and of court likewise point to an historical disapprobation surrounding the propriety of looking behind the jury's verdict. Federal Rule of Evidence 606(b) codified the long sustained judicial determination that a juror may not testify as to the internal deliberations of the jury for the purpose of impeaching the verdict. The Supreme Court recognized as early as 1915, that the rule disallowing jurors to testify concerning their internal deliberations served to protect the "frankness and freedom of discussion and conference" that is so necessary to the functioning of the jury as an institution. *McDonald v. Pless,* 238 U.S. 264, 267–68, 35 S.Ct. 783, 784–85, 59 L.Ed. 1300 (1915). Rule 19 of the General Rules of the United States District Court for the District of New Jersey precludes attorneys or parties to an action either individually or through an agent from directly or indirectly interviewing jurors.

All of these doctrines, rules and practices provide overwhelming support for the recognition of the existence of a compelling societal and governmental interest in maintaining the secrecy of the jury deliberative process and protecting jurors from harassment, judgment and/or punishment after rendering a verdict. *See Press-Enterprise I,* 464 U.S. at 515, 104 S.Ct. at 826–27 (Blackmun, J., concurring) (recognizing state interest "in protecting juror privacy even after trial—to encourage juror honesty in the future" and stating that the state interest "almost always will be coextensive with the juror's own privacy interest"). Notwithstanding this historical tradition, the current onslaught of post-verdict juror interviews teaches the public, which is made up of countless potential jurors, that jury deliberations are not secret, and that if a person were to sit on a jury, chances are he or she too could be expected to be interviewed. *See* Goldstein, *supra,* at 297. One may retort that the juror could simply refuse. As one circuit court has recognized as a truism, however, "reporters are persistent and tenacious in pursuing information and that they seek it regarding the nonpublic portions of legal proceedings (jury deliberations, bench conferences between court and counsel, excluded evidence, etc.) as well as public ones." *United States v. Harrelson,* 713 F.2d 1114, 1117 (5th Cir.1983), *cert. denied,* 465 U.S. 1041, 104 S.Ct. 1318, 79 L.Ed.2d 714 (1984).

The danger in allowing unfettered probing into juror deliberations is found in the discouragement of the free and open operation of the deliberative process. The value in insulating jurors from such intrusion is to protect the interest of future defendants and of the public in open, unfettered discussion by members of a collective body. *Rakes v. United States,* 169 F.2d 739, 745 (4th Cir.) ("If jurors are conscious that they will be subjected to interrogation or searching hostile inquiry to what occurred in the jury room and why, they are almost inescapably influenced to some extent by that anticipated annoyance"), *cert. denied,* 335 U.S. 826, 69 S.Ct. 51, 93 L.Ed. 380 (1948); *Doherty,* 675

F.Supp. at 724 (citing *Clark v. United States,* 289 U.S. at 12–13, 53 S.Ct. at 468–69). Common human experience dictates that one's candor may be compromised when one fears that his or her thoughts and comments revealed during the deliberation process may be revealed to the public immediately upon rendering a verdict and being discharged. The problem is further intensified if jurors may be repeatedly importuned by persistent and tenacious reporters inquiring into the specifics of the deliberations.

"Applying the Supreme Court's test of 'experience and logic' thus leads ... not to a facile answer, but to a quandary." *United States v. Edwards,* 823 F.2d 111, 116 (5th Cir.1987), *cert. denied,* 485 U.S. 934, 108 S.Ct. 1109, 99 L.Ed.2d 270 (1988). On the one hand, the identity of jurors being known to the public is an historical attribute of the jury system serving the laudable function of allowing "the public to verify the impartiality of the key participants in the administration of justice." *In re Globe,* 920 F.2d at 94. On the other hand, the secrecy of jury deliberations is also an historical attribute of the jury system serving the equally laudable purpose of ensuring free and frank discussions among jurors without fear of reprisal, judgment, embarrassment and/or harassment following the rendering of the verdict. *Id.* at 95. Such freedom of debate is necessary for the fair administration of justice in all cases pending and in all cases yet to be born.

"A federal judge is not the mere moderator of a jury trial; he is its governor for the purpose of insuring its proper conduct." *Harrelson,* 713 F.2d at 1117. Thus, the trial judge is accorded broad discretion to ensure the fair administration of justice throughout a trial. *Journal Publishing Co. v. Mechem,* 801 F.2d 1233, 1236 (10th Cir.1986) (noting that trial courts have a wide discretion in being able to protect the judicial process from influences that pose a danger to effective justice). Such discretion allows the trial judge to draw from the law in combination with his common experience in making decisions concerning evidentiary issues, extent of cross-examination, as well as the handling of jurors. *Harrelson,* 713 F.2d at 1117. The fair administration of justice in this instance requires that the Court not promote one interest at the expense of the other, but rather make the proper accommodation between the two interests so that they both may flourish.

## B. The Necessary Accommodation of Competing Interests

### 1. Unsealing of the Voir Dire

Toward this end the Court will unseal the unredacted transcript of the jury *voir dire.* The Court does so in furtherance of ensuring that the "constitutionally protected 'discussion of governmental affairs' is an informed one," *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 605, 102 S.Ct. 2613, 2619, 73 L.Ed.2d 248 (1982) and in recognition of the notion that "public access to criminal trials permits the public to participate in and serve as a check upon the judicial process." *Id.* at 606, 102 S.Ct. at 2620. The release of the *voir dire* which discloses personal information about the jurors, including their names and addresses, will allow for the necessary public scrutiny of the *Antar* trial. The public scrutiny will in turn "enhance[ ] the quality and safeguard[ ] the integrity of the factfinding process" as a whole. *Id.* at 606, 102 S.Ct. at 2619; *see also United States v. Brooklier,* 685 F.2d 1162, 1167 (9th Cir. 1982) (noting the importance of public scrutiny of the jury selection process to the effective functioning of the government as well as the judicial system itself).

### 2. Narrowly Tailored Restrictions

The right to gather news, however, is not absolute. *Zemel v. Rusk,* 381 U.S. 1, 17, 85 S.Ct. 1271, 1281, 14 L.Ed.2d 179 (1965). Nor does it guarantee journalists access to sources of information not available to the public generally. *Branzburg v. Hayes,* 408 U.S. 665, 684, 92 S.Ct. 2646, 2658, 33 L.Ed.2d 626 (1972). The Court cannot shut its eyes and ears to the inevitable reality that will flow from the release of the transcripts. This Court need not hold a factual hearing to determine that once the members of the press obtain the names and addresses of the jurors they will contact the jurors and inquire of the jurors, at least in part, about the

discourse that occurred in the jury room. *See Harrelson,* 713 F.2d at 1117 (recognizing that the trial judge did not need to hold a hearing merely to confirm matters of common knowledge). Not only is this conclusion supported by common experience, but since the initial request for the names and addresses of the jurors, counsel for the AP has made no secret of the press' intent to inquire, at least in part, into the internal deliberations of the jury. The Court finds that granting the press unconditional access to the jury would present a substantial threat to the administration of justice by endangering the deliberative process.

Accordingly, the Court finds it necessary and proper to place limitations on the extent and nature of such questioning. Such limitations are necessary to preserve the interests of promoting the secrecy of jury deliberations and protecting jurors from harassment should members of the press become overzealous in their quest for that which they have no particular right to know. *Accord Harrelson,* 713 F.2d at 116 (noting that in connection with preventing the substantial threat to the administration of justice, "jurors, even after completing their service, are entitled to privacy and to protection against harassment").

### a. Promoting of Juror Privacy

█ In this regard, it is beyond dispute that a juror has no obligation to talk to anyone about any aspect of the *Antar* trial. Each and every juror may, if he or she so chooses, refuse to offer any comment to anybody about any aspect of the case. As counsel for the Star–Ledger conceded at oral argument, even jurors have a right not to be harassed. Recognizing the persistency and tenacity which characterizes any good reporter, the Court finds it necessary to state explicitly, that repeated requests to a juror for an interview or for specific information are strictly prohibited. In other words, once a request for an interview from a specific juror is made and refused by that juror, no other request may be made by the requesting party or by anyone related to or in privity with that party in any way, shape or form. Moreover, once a juror expresses a desire to conclude an interview already in progress, the interviewer must immediately cease all questioning of that juror.

These rules of the game do not impede the press' ability to exercise its First Amendment right to question a juror who is ready and willing to talk. These rules simply balance the public's First Amendment right of access to the names and addresses of the jurors against the competing and deserving right of the juror to choose not to be interviewed and to remain free from harassment.

### b. Maintaining Secrecy of Jury Deliberations

█ Although the internal discussions among jurors during deliberations and the processes employed in reaching a verdict may be said to be confidential and/or privileged, *see Clark,* 289 U.S. at 12–13, 53 S.Ct. at 468–69, there can be no doubt that jurors may and, in the opinion of this Court, far too often do waive that privilege and divulge those confidences. However, as demonstrated above, neither the public nor the press enjoy any special right of access under the First Amendment to this information. Accordingly, for the purpose of promoting the governmental and/or societal interest in encouraging the sanctity of the deliberative process, the Court finds it necessary to impose narrowly tailored restrictions on the nature of the questions that may be asked of jurors.

In this regard, no person may inquire into the specific vote, statement, opinion, thoughts or other comments of any juror during deliberations other than the juror being interviewed. If a juror freely chooses to disclose such information so be it. This Court, unfortunately, is powerless to prevent such happenstance. To the extent that the Court can take steps to discourage or reduce the chances of such a disclosure, however, the Court wholeheartedly believes that it is proper and imperative that it does so. The limitations imposed by the Court do not restrict the members of the press from obtaining any information to which they have a right of access. Nor do they completely curtail the press from questioning jurors. The press remains free to ask jurors a wide variety of questions. The restrictions are

merely narrowly tailored to serve the specific interest of protecting and promoting the secrecy of the deliberative process. The restrictions serve to guard against a future juror's reluctance to openly share his or her opinions for fear that those opinions will be revealed by fellow jurors to all inquiring minds outside of the inner sanctum of the jury room. *See In re Globe*, 920 F.2d at 98 (recognizing that· "[j]ury service can be burdensome enough without the publicizing of heartfelt discussions taking place in what most people properly regard as confidential circumstances"); *see also In re Express–News Corp.* 695 F.2d 807, 811 (5th Cir.1982) (recognizing that trial court may instruct jurors on their freedom not to speak).

Support for such restrictions are well-grounded in the case law. Similar restrictions were upheld by the Fifth Circuit in *United States v. Harrelson*, 713 F.2d 1114 (5th Cir.1983), *cert. denied*, 465 U.S. 1041, 104 S.Ct. 1318, 79 L.Ed.2d 714 (1984). In *Journal Publishing Co. v. Mechem*, 801 F.2d 1233, 1237 (10th Cir.1986), the Tenth Circuit struck down the trial court's sweeping restraint which prohibited all contact between the press and jurors without a compelling reason. In so doing, however, the court stated that the lesser restrictive alternatives of (1) instructing the jurors that they may refuse to be interviewed and may seek the aid of court if the interviewers persisted, and (2) telling the jurors not to discuss the specific votes and opinions of other jurors would have been permissible. *Id.*

Furthermore, in *In re Globe Newspaper Co.*, 920 F.2d 88 (1st Cir.1990), the First Circuit indicated that the district court's refusal to release the names and addresses of the jurors would have been justified if the court had made findings on the record that access to the jurors' names and addresses presented "a substantial threat to the administration of justice." *Id.* at 97. Without passing on the extent of a judge's authority to enter restrictions· similar to those that appear in the *Harrelson* case, the *Globe* court made known its views that it is unfortunate when jurors choose to divulge the confidences shared in the jury room and that

reporters should recognize "that a special historical and essential value applies to the secrecy of jury deliberations." *Id.* at 91, 94.

Thus,·*Globe* supports this Court's ruling in two respects. First, this Court has made a finding that unconditional access to the names and addresses of the jurors in the instant case presents "a substantial threat to the administration of justice" warranting the narrowly tailored limitations detailed above. Second, while the First Circuit had no occasion to reach a final resolution on the specific issue now before this· Court, it did recognize the historical. significance and the continued value in maintaining and promoting the secrecy of jury deliberations. More significantly, the First Circuit explicitly stated that there was no general public right to know what occurred in the jury room. Thus, although not directly supporting this Court's ultimate Order, *Globe* supports the foundation on which the Order is premised.

### 3. Letter from the Court

■ There remains one last point which I must address. Attached as Appendix A is a letter which I intend to send to each juror who served in the *Antar* trial upon the filing of this Opinion. At the October 18, 1993 hearing, counsel for the press expressed concern about this Court taking steps ·to inform the jurors that their names and addresses had been released and that they had certain rights regarding whether or not they were bound to grant interviews to the press or to anyone else. Various arguments were raised in opposition to any such action. Those concerns were reiterated in various submissions to the Court following the hearing. The arguments can be summarized as: (1) this Court is presently without any authority to send such a letter; and (2) any communication from the Court at this time would have a general chilling effect discouraging the jurors from granting interviews.

This case did not end in the usual manner where the jury is discharged immediately subsequent to rendering the verdict. Instead,·as a result of the government's dismissal of the forfeiture allegations, I called each juror individually and thanked him/her for his/her service. At that time, I notified

each juror that the press had made an application for the release of the names and addresses of the jurors and that I would make a determination on that application at a later date. Had it not been for the unusual posture of this case, however, I would have had the opportunity to thank the jury in person as a collective body right in my courtroom. At that time, it would have been permissible for me not only to advise the jurors of their rights to speak or not to speak to the press, but to also suggest to them that in the interest of preserving the confidences that they shared during deliberations, the wiser course of action would be to decline to give interviews. *See In re Globe*, 920 F.2d at 94–95 (recognizing that it is "common" and "wise custom" for trial judges to advise jurors not to discuss what occurred in the jury room); *Doherty*, 675 F.Supp. at 723–24 (counseling jurors to refrain from discussing deliberations with anyone).

No party has cited any authority to the contrary. The press merely contends that this Court lacks authority to communicate with the jurors now that they have been discharged. In this regard, I note that the Fifth Circuit in *In re Express–News Corporation*, 695 F.2d at 810, specifically recognized that jurors are entitled to protection against harassment even after they have completed their duty. *Cf. United States v. Radonjich*, 1 F.3d 117 (2d Cir.1993) (court imposed restrictions on juror interviews where defendant in jury tampering case claimed he needed to interview jurors to prepare for his defense); *United States v. Miller*, 403 F.2d 77, 81–82 (2d Cir.1968) (concluding that the trial judge has the power to order that post-verdict interrogation of jurors shall be done under his supervision); *United States v. Cauble*, 532 F.Supp. 804, 808 (E.D.Tex.1982) ("it is axiomatic that a district judge has the power, and sometimes the duty, to order that all post-trial investigation of jurors shall be under his supervision"), *aff'd*, 757 F.2d 282 (5th Cir.1985), *cert. denied*, 474 U.S. 994, 106 S.Ct. 406, 88 L.Ed.2d 357 (1985).

Surely, acting within the broad supervisory role of the trial court in ensuring the fair administration of justice and as a matter of common human decency, this Court may at the very least inform the jurors that their names and addresses have been released to the public. Furthermore, I can think of no reason nor has a persuasive reason been presented to me in support of the contention that I may not advise the jurors of their rights not to speak or to speak to anyone who questions them about the case. Finally, as set forth in detail above, there exists a compelling governmental and societal interest in preserving the secrecy of the deliberative process. The suggestions contained in the letter are directed only at promoting that interest as they encourage jurors not to reveal the confidences openly exchanged during deliberations.

I reject the contention of the press that any communication from the Court so long after the jurors have been discharged will lead ineluctably to the jurors' inference that there is some unusual danger present in this case in discussing the jury process. As stated above, had I discharged the jury in person, I could have conveyed to them at that time my opinion that they should not reveal to anyone the confidences which they shared during deliberations. Clad in black robe, seated high on my bench, flanked by two American flags, and filled with all of the emotion I could have mustered, I could have stared each one in the eye and explained to him the role he played in the fair administration of justice. I could have suggested to him that revealing his individual thoughts and comments and those of his fellow jurors would not advance the fair administration of justice in the future. I dare say, the members of the press may not have liked such comments, but there would have been nothing improper with me sharing such heartfelt thoughts with the jurors at that time.

I fail to see where sending a letter at the present time presents any more of a so-called chilling effect than if, given the opportunity, I had made the identical comments at the close of the case. In fact, I would think that emotion-filled words spoken by a silver-maned jurist in the solemn setting of a courtroom would have more force than an impersonal and informative letter sent five months

after the close of the case. I am simply unpersuaded that the timing and form of the communication amounts to an infringement upon the right of the jurors to decide for themselves whether or not they will discuss the jury process and, if so, to what extent.

### CONCLUSION

For the reasons set forth above, I will issue an Order unsealing the transcript of the *voir dire* proceeding and allowing the unredacted transcript to be freely accessed by the public. Within the Order unsealing the transcript, I will incorporate the limitations on juror interviews as set forth herein.

/s/ Nicholas H. Politan
NICHOLAS H. POLITAN
U.S.D.J.

### APPENDIX A

Dear Juror [name of juror inserted herein]:

I am writing to advise you that I have unsealed the public record wherein your name and hometown are identified. As a former member of the jury in the case of *United States v. Eddie Antar, et al,* you may be contacted by members of the media regarding your service as a juror.

Please be advised that you are under no obligation to grant an interview to anyone. On the other hand, I advise you that you have a right to talk to anyone about any aspect of the case, if you so choose.

I do wish to share with you, however, some thoughts concerning the role that you played as a juror in our system of justice and I ask that you keep these thoughts in mind when and if you are ever questioned about the case. Your deliberations were conducted in complete privacy. Undoubtedly, through the course of the deliberations many thoughts, comments and opinions were shared by all of you. Indeed, throughout history, all juries have deliberated in secret to encourage each juror to state his or her thoughts, openly and candidly. This tradition of secrecy is a hallmark of the jury system. It ensures that a juror can freely express his or her mind in the jury room without fear that another juror may repeat publicly what he or she shared in confidence. Accordingly, I suggest to you that our jury system functions better if jurors continue to respect the privacy of the jury room after their deliberations have concluded.

Pleased be advised that I have issued an Order in this matter wherein I have established the following guidelines that must be followed by anyone who seeks to interview you about your experience as a juror on the *Antar* case:

(a) no juror is under any obligation to grant an interview nor may any juror be compelled to do so;

(b) repeated requests of a juror for an interview by any person or any associate of that person are strictly prohibited;

(c) once a juror expresses a desire to conclude an interview already in progress, the interviewer must immediately cease all questioning.

Finally, although you are free to discuss any aspect of the case, you should be aware that no one may ask you about the specific vote, statement, opinion, thoughts or comments of any juror other than yourself.

These limitations have been imposed by the Court in your interest and in the interest of promoting the fair administration of justice in the future. Please do not hesitate to contact this Court (201–645–6340) should you believe that any of these limitations have been violated.

Once again, I thank you for your cooperation in this matter and for the conscientious way in which you approached your task.

Very truly yours,

/s/Nicholas H. Politan

U.S.D.J.