

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-25-1994

# USA v. Antar

Precedential or Non-Precedential:

Docket 93-5732

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

## Recommended Citation

"USA v. Antar" (1994). *1994 Decisions.* Paper 165.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/165

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


Nos. 93-5732; 93-5733; 94-5006


UNITED STATES OF AMERICA

v.

EDDIE ANTAR

(Newark New Jersey District Criminal No. 92-cr-00347-1)

MITCHELL ANTAR

(Newark New Jersey District Criminal No. 92-cr-00347-2)

ALLEN ANTAR

(Newark New Jersey District Criminal No. 92-cr-00347-3)

EDDIE GINDI

(Newark New Jersey District Criminal No. 92-cr-00347-4)

  Newark Morning Ledger Co.,
  publisher of The Star-Ledger

        Appellant in 93-5732

  Associated Press,

        Appellant in 93-5733

  New Jersey Press Association,*

    *(Intervenor in D.C.)

        Appellant in 94-5006



On Appeal From the United States District Court
For the District of New Jersey
(D.C. Criminal Action Nos. 92-cr-00347-1; -2; -3; -4)

Argued: March 24, 1994

Before: HUTCHINSON, ROTH and ROSENN, <u>Circuit</u> <u>Judges</u>

(Opinion Filed  October 25, 1994)

Michael Chertoff (Argued)
United States Attorney
Jayne K. Blumberg
Marc N. Garber
Eric L. Muller
Edna B. Axelrod
Assistant United States Attorneys
Office of United States Attorney
970 Broad Street, Room 502
Newark, NJ 07102
        Attorneys for Appellee

Gerald Krovatin, Esquire
Lowenstein, Sandler, Kohl, Fisher & Boylan
65 Livingston Avenue
Roseland, NJ 07068
        Attorney for Allen Antar

Donald A. Robinson, Esquire (Argued)
Steven L. Lapidus, Esquire
Keith J. Miller, Esquire
Robinson, St. John & Wayne
Two Penn Plaza East
Newark, NJ 07105
        Attorneys for Newark Morning Ledger Co.

Thomas J. Cafferty, Esquire (Argued)
Arlene M. Turinchak Esquire
McGimpsey & Cafferty
285 Davidson Avenue
Somerset, NJ 08873
        Attorneys for New Jersey Press Association

Richard N. Winfield, Esquire
David A. Shulz, Esquire (Argued)
Thomas J. Lilly Esquire
Rogers & Wells

200 Park Avenue
New York, NY 10166

Richard P. O'Leary, Esquire
McCarter & English
Four Gateway Center, 100 Mulberry Street
P. O. Box 652
Newark, NJ 07101-0652
          Attorneys for The Associated Press


OPINION OF THE COURT


ROTH, Circuit Judge:

        We are confronted in this case with a tension between
two issues of critical constitutional concern:  the need to
protect the confidentiality of jurors' deliberations while, at
the same time, guaranteeing the right of the press and the public
to have access to court proceedings.  We conclude that under the
circumstances presented here, the district court improperly
sealed the transcript of the jury voir dire and then upon
unsealing it, placed certain improper restrictions on the use of
the juror-identifying information.  We will, therefore, reverse
the order of the district court sealing the record, and we will
reverse in part and affirm in part the restrictions imposed by
the district court on the conduct of juror interviews.

        This appeal arises from several high-profile criminal
prosecutions for securities fraud, RICO conspiracy, mail fraud,
and related charges.  Appellants, the Associated Press, the New
Jersey Press Association, and the Newark Morning Ledger Company

(collectively, "the press"), challenge the actions of the district court first in sealing the transcript of the jury voir dire at the end of the trial and, later, in releasing the transcript with restrictions placed upon its use. The restrictions apply to anyone coming into possession of juror-identifying information from the transcript; they circumscribe the substance and extent of any questioning of the former Antar jurors.

We find that the sealing of the transcript was accomplished prematurely. It was done without adequate notice, without a hearing, and without factual findings being placed on the record. We further find that the restrictions imposed on the use of juror information at the time of the unsealing were not supported by an actual or potential threat either of juror harassment or of invasion of the deliberative process as it was taking place.

We do not minimize the importance of confidential jury deliberations or of the need to protect former jurors from harassment. Nor do we intend to suggest that the restrictions which we find to have been improperly imposed here may not be permissible in some future case. In order to restrict the right of access, however, a court must carefully articulate specific and tangible, rather than vague and indeterminate, threats to the values which the court finds override the right of access.

There are, of course, instances when the jurors' identities should be concealed in order to protect against tampering or coercion or threats.  See, e.g., In re Globe Newspaper Co., 920 F.2d 88, 97 (1st Cir. 1990).  Moreover, harassment of jurors by the press after the completion of a trial may adversely affect the willingness of citizens to freely participate in the jury system.  This court has not yet, however, faced the question of restricting access to court proceedings or to transcripts of those proceedings in order to protect the jurors' from post-trial contact with the press.

Under the circumstances presented in this case, we conclude that the precedent of Press Enterprise Co. v. Superior Court of California, 464 U.S. 501, 104 S.Ct. 819 (1984) ("Press-Enterprise I"), is directly controlling.  We hold, therefore, that the presumptive right of access applied to the voir dire proceedings as they were recorded in the trial transcript.[1] Applying the requirement that detailed findings of the need for restrictions be made before any restriction is imposed, we find that the court's initial order, sealing the transcript, violated procedural and substantive aspects of the press's right of access to the voir dire transcript.[2]  The subsequent release of the

_____

[1].  The parties agree that there was a contemporaneous right of access to the courtroom at the time of the jury voir dire.

[2].  To the extent that Judge Rosenn in his thoughtful concurring opinion differentiates "specific" from "detailed", we are not persuaded that the difference is significant.  Our conclusions, as are his, and the discussion that follows from our conclusions are based on the precedent of Press-Enterprises I and its

transcript was not a cure for this violation of access.

Moreover, certain of the restrictions placed upon the use of the information in the transcript, contained in the court's second order unsealing the transcript, were too broad in view of the lack of any specific recorded findings of actual or imminent threat of juror harassment.

I.

A.  The Trial and the Sealing of the Transcript

The six week trial in this criminal action began on June 1, 1993.  The defendants, founders of a well-known consumer electronics chain, Crazy Eddie's, were accused of various corrupt business practices, including a scheme of securities fraud.

Because of pre-trial publicity, the district court requested a large pool of potential jurors.  As a result, on the first day of trial, there were not enough seats in the courtroom. Before starting the voir dire examination of the potential jurors, the court asked that members of the press leave the courtroom in order to free up additional seats.  This appears to have been a request rather than an order.  The press voluntarily complied.  The voir dire continued for two additional days.

(..continued)
progeny, including United States v. Raffoul, 826 F.2d 218 (3d Cir. 1987) and United States v. Simone, 14 F.3d 833 (3d Cir. 1994).  We also share with Judge Rosenn his concern about the burden we place upon the district courts.  However, we believe that what we have required is consistent with Press Enterprises I and its progeny.

During that period, the members of the petit jury stated their names and hometowns on the record. Although the voir dire was an "open" proceeding, in that the courtroom was not closed to non-participants, the absence of the members of the press at the court's request prevented them from learning the identities of the Antar jurors.

The press was present during the remainder of the trial. Toward the end of the trial, on the day that summations were given and the jury retired, Richard P. O'Leary, counsel for the Associated Press ("AP"), sent a letter to the court, requesting the names and addresses of the jurors. Joint Appendix ("App.") at 203-04. O'Leary sent the letter because the AP hoped to interview the jurors after the verdict. The combination of the press's absence from the voir dire and the fact that the record of the proceedings had not yet been transcribed left the press in a curious position. Though the names of the jurors were public information and anyone present during the voir dire might know their identities, the press did not. In his letter, O'Leary noted the news organization's interest in speaking to members of the jury after the conclusion of the trial. He attempted to ease any concerns the court might have had about potential contacts with the jurors prior to the conclusion of deliberations by stating: "As an officer of the court, I represent that I would not disclose this information to the AP until after the verdict has been returned." Id.

The court's response to O'Leary's request was to immediately seal the transcript of the voir dire proceedings and other portions of the public record containing juror identifying information. This was done <u>sua sponte</u>: no hearing was held and no findings were made.[3]

### B. The Post-Sealing Hearings

Four days later, on July 20, 1993, the jury returned its verdicts, convicting Eddie Antar and Mitchell Antar of multiple counts of securities fraud. The AP then moved to intervene in order to obtain the release of the jurors' names and addresses. In the meantime, the district court had not dismissed the jury because of a pending civil forfeiture action against the Antars. However, on August 2, two days before the jury was to reassemble, the government moved to dismiss the forfeiture action. The court granted the dismissal and agreed that it would discharge the jurors by telephone, rather than requiring them to return to the courthouse. Because the jurors were not physically present, the press were unable to approach them at the conclusion of their jury service.

At the same time, the court raised the issue of the AP's motion to intervene. Counsel for the AP reiterated the

---

[3]. The only documentation of the closure appears in the district court's docket sheet. Entry #94 reads in part: "Ordered minutes of 6-3-93 and transcript sealed until further order of court. . . . F[iled] 7-16-93." App. at 8.

press's interest in obtaining the jurors' names and addresses so that they could be interviewed.  The district judge responded:

> I'm very interested in that issue.  I'm a bit baffled by it, to be perfectly frank with you, because everything we do in this system of justice is designed to protect the secrecy of the jury proceedings.

App. at 106.

The AP countered by arguing that the First Amendment established a right of access to jury voir dire proceedings.  In keeping with its concerns, the court replied that it would require the press to rebut a presumption that communications with jurors may be limited in order to ensure free and confidential jury deliberations in the future.

> We got a collision.  We got some First Amendment collision with that rule [Fed. R. Evid. 606(b)].[4]  We got a collision with the whole jury system here.  I mean . . . you folks are going to have the laboring oar

4.  Federal Rule of Evidence 606(b) provides:

> **(b) Inquiry into validity of verdict or indictment**.  Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.  Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

here. I'll tell you that. I'll give you a
hearing, obviously. You have a laboring oar
with me to show me . . . what, if any,
prevailing news gathering or First Amendment
arguments are sufficient to overcome the very
sacred nature of a jury's deliberations.

It would seem to me--I'm just talking flat
out. What are you going to ask the jury?
How did you vote? What did your fellow
jurors think? What evidence impressed you?

These are all things which fall squarely
within the proscriptions of that rule. I
can't call them to testify as to that.

App. at 107.

The judge then voiced his reluctance to release the

identities of the jurors because of his concern about the growing

trend of jurors in high-profile cases to discuss their

deliberations post-trial. He expressed his concern in stating:

All of a sudden, the minute they finish their
job, you send them outside and the press can
go asking them about their feelings about the
case? How did you vote in the case?

This sensationalism has got to stop some
place. We have to get back to our system of
justice. . . . There is something radically
wrong if we're trying cases in the press.

App. at 110.

The district judge's focus on Rule 606(b) is evident

from his comments. The judge indicated that this rule helps to

promote secrecy, which, in turn, promotes the health of the

deliberative process. He emphasized his belief that the

limitations of Rule 606 apply equally to press interviews as they

do to investigations into the validity of a verdict: "I'm stuck on question number one, which is what can you ask a juror which . . . does not fly in the face of what 606(b) talks about?" App. at 113.

While the above concerns applied to the continued sealing of the transcripts, the judge also explained why he believed the initial closure order to have been necessary:

> I sealed it all [the transcript and court documents containing juror-identifying information] because I wasn't going to have my ruling subverted, hopefully. I sealed everything.
>
> . . .
>
> The purpose of my gag order was very simple. It was to get back to the very basic and fundamental issue of having a jury not affected by any outside influences, including the outside-of-the-court statements made by counsel for the government or for the defense.
>
> I've accomplished my purpose. Absolutely.

App. at 124.

In concluding, the judge explained that he would be calling the jurors later that day to discharge them and that he would "strongly suggest, in view of their duties, that they not discuss the matter with the press at least insofar as their deliberations are concerned." App. at 117. The judge cautioned the press that they should not contact the jurors pending a final decision, even if they were to come across the jurors' identities through legitimate means. "I would recommend that they await

this Court's ruling. . . . If they want to take me on, be my guest. . . . [I]t might be considered inappropriate to go ahead and try to do some investigative work on the jury in the interim before you have intervened in the proceeding." App. at 119-120. At the end of the hearing, the judge scheduled argument for August 23 on the questions of intervention and of the release of the jurors' identities. The argument date was subsequently postponed to October 18.

The Newark Morning Ledger Company and the New Jersey Press Association then joined the AP in the motion to intervene.[5] After full briefing of the issues, at the October 18, 1993, hearing, the district judge permitted the interventions. He also reiterated his concerns about protecting the jury deliberation process:

> You're talking about invading the jury room.
> . . . You're going to ask them what the
> deliberations were about, what was important,
> what was unimportant, who voted for what, was
> there a split on this.

---

[5]. In addition, defendant Eddie Antar addressed the issue before the district court, arguing in favor of release of the voir dire transcripts. Letter from David W. Fassett, Esq. to Judge Nicholas H. Politan (Aug. 26, 1993), App. at 208-212; Transcript of Proceedings, October 18, 1993, App. at 184-86. Antar based his argument upon the criminal defendant's Sixth Amendment right to a public trial, suggesting that this right mandated disclosure of all sealed transcripts. In particular, he relied upon Waller v. Georgia, 467 U.S. 39, 104 S.Ct. 2210 (1984), as well as this court's findings that subsequent public access to transcripts helps to fulfill the constitutional purpose of an open trial, United States v. Smith, 787 F.2d 111, 114 (3d Cir. 1986). Antar has not raised this issue on appeal, and we see no need to address it here.

. . .

> That is what you gentlemen are espousing.
> You gentlemen are espousing opening that door
> and letting the public know everything that
> goes on in the deliberative process under the
> guise of the First Amendment.  Not for the
> purpose of  . . . doing some analytical study
> of the juror, but to sell a newspaper, sir.
> That's all you're looking to do.  Sell
> newspapers.  Don't ever forget it.

App. at 144-45.  The judge further questioned whether there could be any "valid public interest" in learning, after the fact, about jury deliberations in a criminal case.

### C.   The District Court Opinion

The transcripts remained under seal until December 13, 1993.  On December 9, 1993, the district court issued its order and opinion unsealing the records, to become effective four days later.  United States v. Antar, 839 F.Supp. 293 (D.N.J. 1993).

In its opinion, the district court quickly disposed of the matter of the initial sealing.  The court explained that the AP's letter requesting the jurors' names and addresses had caused immediate concern by raising the possibility that the press would interfere with the jurors prior to their rendering a verdict.  In response, "the court found it necessary to exercise its broad discretion in supervising the fair administration of justice," and so it sealed the transcripts and other court records containing juror-identifying information.  Id. at 298.

The court then turned to consideration of whether the transcripts should now be unsealed.  The court characterized the

press's claim of access as an "assertion of a right to invade the secret deliberations in the jury room." Id. at 296. In analyzing whether the press possessed a legitimate claim to the voir dire transcripts, the court framed the issue as whether the press had a First Amendment right of access to the jurors identities. Examining this potential "right of access to jurors' identities," the court found that, (1) historically, the identities of jurors have been known to the community, and (2) such knowledge promotes the values of openness, fairness, and the perception of fairness in the criminal justice system. Turning to the fact that access to jurors' identities facilitates post-verdict interviews by the press, however, the court found that this practice "bodes ill for the continued vitality and authoritativeness of the jury system," id. at 302, and suggested that "the need for secrecy of jury deliberations is fundamental to the tradition of justice." Id.

The court, then, recognized two compelling, if competing, interests. Historical practice and values weighed in favor of open recognition of jurors' identities; weighing against disclosure was the "compelling societal and governmental interest in maintaining the secrecy of the jury deliberative process and protecting jurors from harassment, judgment and/or punishment after rendering a verdict." Id. at 303. Of primary concern to the court was the likelihood that probing jury deliberations

would discourage free and open exchange during the deliberative process:

> Common human experience dictates that one's candor may be compromised when one fears that his or her thoughts and comments . . . may be revealed to the public immediately upon rendering a verdict and being discharged.

Id. at 304.[6]

The court determined that the "fair administration of justice" required it to make an accommodation between the two interests, balancing each, rather than promoting one at the expense of the other.  As such, the court ordered the unsealing of the voir dire transcripts and other public documents but placed restrictions upon "any person" who might seek access to the information contained therein.

The court imposed four limitations on juror contacts by "any person who comes into possession of the transcript of the juror voir dire and the juror identifying information contained therein . . .."  The first restriction, "(a) no juror is under any obligation to grant an interview nor may any juror be compelled to do so," is consistent with the routine instructions customarily given to jurors in the federal court system.  See Administrative Office of the United States Courts, Handbook for Trial Jurors 11 (1991).  839 F.Supp at 295.

---

[6].  Specifically, in the text of its order, the court held that "Providing unfettered access to the press and the public in general . . . presents a substantial threat to the administration of justice by endangering the deliberative process."  Id. at 295.

Though the court made no mention of actual or threatened harassment of the jurors in this case, it described the next two limitations as protecting the jurors from harassment. These limitations restricted the manner in which the Antar jurors might be approached and interviewed:

> (b) repeated requests of a juror for an interview are strictly prohibited;
>
> (c) once a juror expresses a desire to conclude an interview already in progress, that interviewer must immediately cease all questioning[.]

Id. In fact, the court recognized that it was imposing these restrictions as a preemptive, rather than reactive, step, to protect the jurors "should the members of the press become overzealous in their quest for that which they have no particular right to know." Id. at 305.

> The fourth limitation was addressed to the interest in maintaining the confidentiality of the jury deliberations. It provided that
>
> (d) no inquiry may be made into the specific votes, statements, opinions or other comments of any juror during deliberations other than the juror being interviewed.

This also is consistent with the provisions of the federal Handbook for Trial Jurors, which instructs federal trial jurors that "the court may enter an order in a specific case that during any such interview, jurors may not give any information with respect to the vote of any other juror." Id. at 11. Commenting upon the fourth restriction, the district judge acknowledged,

however, that the effect of the restriction upon the press' inquiry was somewhat illusory:  "If a juror freely chooses to disclose such information, so be it.  This Court, unfortunately, is powerless to prevent such happenstance."  839 F.Supp. at 305.  This fourth limitation, then, inhibited only certain disclosures, i.e., only those solicited by others, rather than those initiated by a juror himself or herself.

The district judge summed up his justification for this final restriction, stating:

> The restriction[] serve[s] to guard against a future juror's reluctance to openly share his or her opinions for fear that those opinions will be revealed by fellow jurors to all inquiring minds.

Id. at 306.

Finally, the court's opinion set out the provisions of a letter to be sent to the jurors simultaneously with the release of the court's opinion and order.  Id. at 306-08.  The letter explained to the jurors that their names and addresses were being unsealed, and it warned that they might be contacted by members of the press.  The court noted that each juror had "a right to talk to anyone about any aspect of the case, if you so choose."  Id. at 308.  The court, however, asked the jurors to keep the views of the court in mind when dealing with the press.  In particular, the court advised:

> This tradition of secrecy is a hallmark of the jury system. . . . Accordingly, I suggest to you that our jury system functions better if jurors continue to respect the privacy of

> the jury room after their deliberations have
> concluded.

Id.  The letter ended with a recitation of the limitations imposed in the court's order.

The press responded to the order by filing this timely appeal.


## II.

### A.

The district court had jurisdiction over the underlying criminal prosecutions pursuant to 18 U.S.C. § 3231.  Under 28 U.S.C. § 1291, we have appellate jurisdiction to review final decisions of the district court.  We have previously noted that orders either granting or denying access to portions of a trial record are appealable as a final orders pursuant to § 1291. United States v. Raffoul, 826 F.2d 218, 222 (3d Cir. 1987); Smith, 787 F.2d at 113.

The existence of statutory jurisdiction does not settle the question, however.  Under Article III, § 2 of the Constitution our ability to exercise judicial power extends only to live cases and controversies.  The court's December 9 order currently affects the rights of the parties, so it presents such a case.  At first glance, however, the July 16 sealing order appears to have been mooted by the December 9 order because the transcripts have, in fact, been unsealed.  On that issue, no

meaningful relief remains to be granted, and an opinion on the matter would appear to be advisory in nature.

We believe, however, that the court's sealing of the voir dire falls within that class of cases which are "capable of repetition, yet evading review." Southern Pacific Terminal Co. v. Interstate Commerce Comm'n, 219 U.S. 498, 515, 31 S.Ct. 279, 283, (1911). See, e.g., Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 6, 106 S.Ct. 2735, 2739 (1986) ("Press-Enterprise II"). The "capable of repetition" doctrine is a narrow exception to the mootness principle, appropriately limited to cases satisfying the following two requirements:

> (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable likelihood that the same complaining party would be subjected to the same action again.

Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 349 (1975)(per curium). See also Dia Navigation Co. v. Pomeroy, _ F.3d _ (3d Cir. 1994).

In cases such as this, involving the presumptive right of access to the stages of a criminal proceeding, a prohibition on access is tied in some fashion to the ongoing proceeding. As such, it typically is of short duration and could easily evade review. Cf. Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 102 S.Ct. 2613 (1982). Based on the court's post hoc rationale of protecting the jury during its deliberations, the court could have unsealed the transcripts in a matter of days, once the

verdict had been returned. It did not do so for five months.

However, the fact that the court has now lifted a ban that was

improperly imposed should not work to preclude appellate review.

See Richmond Newspapers, Inc. v. Virginia, 488 U.S. 555, 563, 100

S.Ct. 2814, 2820 (1980) ("This Court has frequently recognized .

. . that its jurisdiction is not necessarily defeated by the

practical termination of a contest which is short-lived by

nature").

The government, however, argues against application of

the "capable of repetition" exception on the ground that the

scenario of this case is unlikely to recur. True, it is unusual

that the crowding of a courtroom during voir dire will leave the

members of the press out in the corridor, where they will not

learn the identities of the jurors. Nonetheless, what is

important is that these parties not again be denied their right

of access to otherwise public transcripts without first receiving

the procedural and substantive protections that are prerequisite

to such exclusions.[7] Accordingly, we will address the merits,

after a brief foray into the standard of review.

---

[7]. This court has consistently found a reasonable likelihood of
recurrence to exist in situations involving denial of press
access to criminal proceedings and transcripts. See, e.g.,
United States v. Simone, 14 F.3d 833, 836-37 (3d Cir.
1994)(closure of post-trial examination of jurors not moot though
proceedings concluded and transcript released); Raffoul, 826 F.2d
at 222 (closure of courtroom during defendant's testimony not
moot though proceedings concluded); United States v. Criden, 675
F.2d 550, 554 (3d Cir. 1982)("Criden II")(sealing of pre-trial
hearing transcript not moot though proceeding concluded and
transcript publicly available). Cf. United States v. A.D., _
F.3d _, _ n.1 (3d Cir. 1994)(closure of juvenile detention and

B.

We exercise plenary review in determining whether the district court applied the proper legal principles first in sealing the transcript and later in unsealing it with limitations. Simone, 14 F.3d at 837; Smith, 787 F.2d at 113 (3d Cir. 1986). As a matter of course, we review the fact-finding of the district court with substantial deference, reversing only for clear error. Fed. R. Civ. P.52(a). In the First Amendment context, however, the Supreme Court has recognized the duty of reviewing courts to engage in an independent factual review of the full record. New York Times Co. v. Sullivan, 376 U.S. 254, 285, 84 S.Ct 710, 728 (1964).[8] Thus we have explained that when

(..continued)
delinquency proceedings, and sealing of transcripts, not moot despite fact proceedings already concluded). In particular, the court has taken notice of the fact that "certainly the press and public will continue to seek access to criminal trials," Raffoul, 826 F.2d at 222, with the prospect that the press may be subject to wrongful closure or sealing orders in the future.

[8]. See also Bose Corp. v. Consumers, 466 U.S. 485, 498-502, 104 S.Ct. 1949, 1958-60 (1984). In Bose, the Court was concerned with an apparent conflict between the seemingly limited scope of review established by F. R. Civ. P. 52(a) and the "independent factual review" required by New York Times v. Sullivan. The Court found the rules to be compatible, based in part upon a weaker presumption of accuracy given to findings of constitutional fact. Specifically, the Court found a more rigorous factual review to be appropriate where the legal rule at issue "assigns an especially broad role to the judge in applying it to specific factual situations," where the rule is "given meaning through the evolutionary process of common-law adjudication," and where the constitutional values protected by the rule "make it imperative" that the rule is correctly applied. Id. at 502, 104 S.Ct. at 1960. Accord United States v. Criden, 648 F.2d 814, 817 (3d Cir. 1981)("Criden I")(finding that scope of "abuse of discretion" review "will be directly related to the

we address a right of access claim, our scope of review is substantially broader than that for abuse of discretion. "This broader review includes independent consideration of the district court's order and the factual findings inferred from the evidence before it." In re Capital Cities/ABC, Inc., 913 F.2d 89, 92 (3d Cir. 1990).

## III.

### A.

We believe that the district court lost sight of the requisites of access to court proceedings because of its concern for protecting the jurors and their deliberations from exposure by the press. The issue of media access to jurors is a topic of vigorous debate, and the views of the district court, as set forth above, are well represented in the literature.[9] Yet in

(..continued)
reason why that category or type of decision is committed to the trial court's discretion in the first instance.").

[9]. On this debate, see, e.g., Abraham S. Goldstein, Jury Secrecy and the Media: The Problem of Postverdict Interviews, 1993 U. Ill. L. Rev. 295 (suggesting that jury's "authoritativeness" and its role as "guardian of community social-justice values" are threatened by public exposure, but arguing that best solution would come from legislature in form of statute prohibiting disclosure of deliberations, as this might support finding of compelling governmental interest overriding First Amendment right of access)(But see Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 102 S.Ct. 2613 (1982) (requiring case-by-case, individualized findings of compelling interest before closure may be ordered and rejecting notion that legislative findings and enactment could support closure in all cases of a given class)); Robert L. Raskopf, A First Amendment Right of Access to a Juror's Identity: Toward a Fuller Understanding of the Jury's Deliberative Process, 17 Pepp. L. Rev. 357 (1990) (advocating a

both of its orders--first sealing the transcript, and then limiting the use of the juror information--the court failed to make findings sufficient to justify its restrictions on access. By recasting the question posed as "whether the press has a right of access to the jurors' identities," the court obscured the central issue in this case:  the propriety of limiting the right of access sua sponte, without findings, and under the circumstances which existed both at the time of the sealing and at the time of the restricted unsealing.

Although the actions of the district judge served to deprive the press of the jurors' identities, this objective was accomplished by means of sealing the voir dire transcript.  Under the Supreme Court's First Amendment analysis, we must look objectively to that which was done and the means by which it was accomplished.  Then, we assess whether those actions comport with the substantive and procedural strictures established to vindicate the "freedom of speech, [and] of the press" guaranteed under the First Amendment.  As such, our analysis starts with the first action taken--the sealing of the voir dire transcript.

B.

(..continued)
right of access to jurors' identities and describing the educational and institutional benefits of juror interviews); Note, Public Disclosures of Jury Deliberations, 96 Harv. L. Rev. 886 (1983)(recognizing that post-trial restrictions on access to jurors implicate First Amendment protections and suggesting that judges use persuasive, rather than prohibitive, techniques, such as judicial supervision of interviews and admonishment of jurors concerning the need to protect the secrecy and confidentiality of their deliberations).

The public right of access to voir dire proceedings in a criminal case is firmly established. The Court's "right of access" jurisprudence began with Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 100 S.Ct. 2814 (1980), in which the Court held that the First Amendment provides the public and the press with a right of access to criminal trials.[10] The case involved a retrial in a murder prosecution that had been closed without findings or consideration of alternatives to closure. Tapes of the proceedings were, however, released as soon as the trial concluded. The Court found that criminal trials are covered by a "presumption of openness," id. at 573, 100 S.Ct. at 2825, so that closure of the proceedings may be justified only by an "overriding interest articulated in findings." Id. at 581, 100 S.Ct at 2829.

In Press-Enterprise Co. v. Superior Court of California, 464 U.S. 596, 104 S.Ct. 819 (1984)("Press-Enterprise I"), the Court specifically addressed whether the guarantees of open public proceedings in criminal trials extend to the voir dire examination of potential jurors. The Court held that they do. Following its analysis in Richmond Newspapers, the Court based its finding of a right of access upon two primary considerations: (1) the lessons of historical practice, and (2)

_____

[10]. 448 U.S. at 576-77, 100 S.Ct at 2827 (plurality); 448 U.S. at 583-84, 100 S.Ct. at 2830-31 (Stevens, J., concurring); 448 U.S. at 585, 100 S.Ct at 2831 (Brennan, J. and Marshall, J., concurring). See also Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 603, 102 S.Ct. 2613, 2618 (1982).

the beneficial value of open proceedings to the functioning of the judicial process and the government as a whole.  See Globe Newspaper, 457 U.S. at 604-06, 102 S.Ct. at 2619.  This has become known as "the test of experience and logic."  Id. at 2620; Simone, 14 F.3d at 837.  In its historical survey, the Court found that jury selection has, since its inception, "presumptively been a public process."  Press-Enterprise I, 464 U.S. at 505, 104 S.Ct. at 821.  With regard to institutional values, the Court concluded that "[o]penness . . . enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system."  Id. at 508, 104 S.Ct. at 823.  As such, the court held that the right of access clearly encompasses voir dire proceedings, so that closure "must be rare and only for cause shown that outweighs the value of openness."  Id.; 104 S.Ct. at 509.

The Court proceeded to set forth the standards to be applied in determining whether closure may be justified on the facts of a given case:

> The presumption of openness may be overcome only by an overriding interest based upon findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.  The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

Id. at 510, 104 S.Ct at 824.  See also Globe Newspaper Co., 457 U.S. at 607, 102 S.Ct. at 2620 (describing test as requiring

showing that closure is "necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest"). These requirements have been restated unequivocally in each of the "right of access" cases since Richmond Newspapers. For example, in the case subsequently known as Press-Enterprise II, 478 U.S. 1, 106 S.Ct. 2735, the Court held that there is a right of access to preliminary hearings conducted pursuant to the California penal code. At issue was an asserted conflict between the defendant's Sixth Amendment right to a fair trial and the First Amendment right of access to criminal proceedings. Even while recognizing that the defendant has an absolute right to a fair trial,[11] the Court emphasized the unyielding substantive and procedural protections that <u>must</u> be satisfied before a trial can be closed to protect that competing constitutional right:

> [T]he proceedings cannot be closed unless specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest. If the interest asserted is the right of the accused to a fair trial, [a proceeding to which the right of access applies] shall be closed only if specific findings are made demonstrating that, first, there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity that closure would prevent and, second, reasonable alternatives to closure cannot

---

[11]. In <u>Press-Enterprise I</u> the Court observed that "No right ranks higher than the right of the accused to a fair trial." 464 U.S. at 508, 104 S.Ct. at 823. <u>See also</u>, <u>Richmond Newspapers</u>, 448 U.S. at 564, 100 S.Ct. at 2821 (describing the right to a fair trial as "superior").

> adequately protect the defendant's fair trial
> rights.

Press-Enterprise II, 478 U.S. at 13-14, 106 S.Ct. at 2743
(citations omitted).[12]  The Court concluded by suggesting that
the mere assertion of a conflict between an established right of
access and a societal or governmental interest--even another
constitutional right--must not be used to defeat the right of the
public and the press to open proceedings.  Rather, particularized
findings must be made on the record in each case, (1)
establishing the existence of a compelling governmental interest,
and (2) demonstrating that absent limited restrictions upon the
right of access, that other interest would be substantially
impaired.  Id. at 15, 106 S.Ct. at 2743 (explaining that "[t]he
First Amendment right of access cannot be overcome by the
conclusory assertion that [open proceedings] might deprive the
defendant of [the right to a fair trial]").

Pursuant to Press-Enterprise I, then, there exists a
presumptive right of access to voir dire proceedings.  This right

---

[12]. Furthermore, while the Court recognized the defendant's
paramount right to a fair trial, it rejected the California
court's analysis that closure may be justified on a mere finding
of a "reasonable likelihood of substantial prejudice."  Instead,
the Court required a more stringent showing of "substantial
probability."  In addition to strengthening the substantive
proofs required, as an analytical matter, the Court rejected the
state supreme court's approach of balancing the right to a fair
trial against the right of access, reminding "these interests are
not necessarily inconsistent. . . . One of the important means of
assuring a fair trial is that the process can be open to neutral
observers."  Press-Enterprise II, 478 U.S. at 7, 106 S.Ct. at
2739.

of access may not be abridged absent the satisfaction of substantive and procedural protections.  On the substantive side, a court ordering closure must first establish that the competing interest asserted is not only "compelling," but also that it outweighs the First Amendment right of access.  Second, it must determine that the limitations imposed are both necessary to and effective in protecting that interest.  One part of establishing the necessity of a limitation is a consideration of alternative measures and a showing that the limitation adopted is the least restrictive means of accomplishing the goal.  See A.D., _ F.3d _; Criden II, 675 F.2d 550.  On the procedural side, these determinations must be covered by specific, individualized findings articulated on the record before closure is effected.  See Simone, 14 F.3d at 840; Raffoul, 826 F.2d at 226; Criden II, 675 F.2d at 554, 560.

### 1.

In the case now before us, the government attempts to evade the implications of the above by suggesting that the actual voir dire proceedings were not closed.  True, no court order excluding non-parties was entered on the record.  Nonetheless, the court requested that the press leave the courtroom, thereby precluding them from obtaining information about the jurors.  The mere fact that the members of the press politely responded to a judicial request, rather than waiting to be compelled by an order, should not inure to their detriment.

That distinction aside, the fact that the courtroom was open during those three days in June is of little import, as we find that the right of access to voir dire examinations encompasses equally the live proceedings and the transcripts which document those proceedings.  See New York v. Chambers, 14 Med. L. Rptr. 1919 (N.Y. Sup. Ct. 1987)(right of access extends to voir dire transcripts, even where press has been present during open voir dire proceedings).  It is access to the content of the proceeding--whether in person, or via some form of documentation--that matters.[13]  Several factors compel this result.

---

[13].  We emphasize, however, that documentary access is not a substitute for concurrent access, and vice versa.  The right of access encompasses both forms, and both are vitally important. Thus, where a right of access exists, a court may not deny access to a live proceeding solely on the grounds that a transcript may later be made available.  Such a transcript would not fully implement the right of access because some information, concerning demeanor, non-verbal responses, and the like, is necessarily lost in the translation of a live proceeding to a cold transcript.  In Simone, 14 F.3d at 842, this court explained,

> Because we have found the district court's findings in this case were insufficient to support closure, we cannot conclude that the release of the transcripts afforded adequate access in this case.  To do so would relax the standard for closure and would undermine one of the essential aspects of access by permitting public scrutiny of proceedings only at this later time.

Of course, where a court follows the procedure outlined above and finds that closure is necessary and effective to preserve an overriding interest, so that the right of access may therefore be temporarily limited, later release of a transcript

First, <u>openness</u> is ongoing--a status rather than an event.  At the heart of the Supreme Court's right of access analysis is the conviction that the public should have access to <u>information</u>; the Court never has suggested that an open proceeding is only open to those who are able to be bodily present in the courtroom itself.[14]  True public access to a

(..continued)
may be the next best means of implementing the right of access. Thus, for example, in <u>Smith</u>, 787 F.2d 111, this court held that the press and the public may be justifiably excluded from sidebar and in camera conferences.  However, we continued to explain that:

> [I]f there has been no contemporaneous observation, the public interest in observation must be effectuated in the next best possible manner.  This is through the common law right of access to judicial records.

<u>Id.</u> at 114-15.

[14]. Specifically, though <u>Press-Enterprise I</u> involved closure of voir dire proceedings, neither the language nor the reasoning of that case suggest that the right of access should be construed to distinguish between concurrent access to live proceedings and later access to a written record.  The Court was concerned with information, not with a particular means of communication.  The Court wrote:

> The value of [the open selection of jurors] lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that <u>anyone</u> is free to attend gives assurance that established procedures are being followed and that deviations will become known.

464 U.S. at 508, 104 S.Ct. at 823.  Similarly, public confidence is furthered by the knowledge that access to the proceedings is available at a later date via the transcript which is a public judicial record.

proceeding means access to knowledge of what occurred there. It is served not only by witnessing a proceeding firsthand, but also by learning about it through a secondary source. In fact, recognition of the crucial role of secondary representation is the basis for the Court's protection of the rights of the media, who have been described by the Court as "functioning as surrogates for the public." Richmond Newspapers, Inc., 448 U.S. at 574, 100 S.Ct. at 2825.[15] Access to the documentation of an open proceeding, then, facilitates the openness of the proceeding itself by assuring the broadest dissemination. It would be an odd result indeed were we to declare that our courtrooms must be open, but that transcripts of the proceedings occurring there may be closed, for what exists of the right of access if it extends only to those who can squeeze through the door?[16]

Furthermore, at the most basic level, the transcript at issue is a public judicial document, covered by a presumptive

---

[15]. The close connection between the rights of the public and the rights of the press has been widely observed. In Nixon v. Warner Communications, 435 U.S. 589, 609, 98 S.Ct. 1306, 1318 (1978), the Court noted that the press "serves as the information-gathering agent of the public." As such the First Amendment generally grants to the press no greater--and also no lesser--right to information about a trial than it does to the public at large. See John E. Nowak & Ronald D. Rotunda Constitutional Law § 16.20 (4th ed. 1991).

[16]. See Criden I, 648 F.2d at 822 (noting that "the public forum values emphasized in [Richmond Newspapers] can be fully vindicated only if the opportunity for personal observation is extended to persons other than those few who can manage to attend the trial in person.").

right of access.  The Supreme Court, in Nixon v. Warner Communications, Inc., recognized an historically-based, common law right to inspect and copy judicial records and documents. 435 U.S. at 597, 98 S.Ct. at 1312.  In fact, this long-established[17] common law right has played a crucial role in the development of First Amendment jurisprudence.  As the First Circuit has observed, "The common law presumption that the public may inspect judicial records has been the foundation on which the courts have based the first amendment right of access to judicial proceedings."  Anderson v. Cryovac, Inc., 805 F.2d. 1, 13 (1st Cir. 1986) (emphasis added).

This court has also noted that the common law right of access to transcripts helps to fulfill the openness of criminal trials assured by the First Amendment and recognized in Richmond Newspapers:  "By inspection of such transcripts, the public, usually through the press, can monitor, observe, and comment upon the activities of the judge and the judicial process."  Smith, 787 F.2d at 115.  Under our guiding jurisprudence, "[t]he existence of a common law right of access to . . . inspect judicial records is beyond dispute."  Publicker Indus., Inc. v. Cohen, 733 F.2d 1059, 1066-67 (3d Cir. 1984).  See, e.g. Leucadia, Inc. v. Applied Extrusion Technologies, Inc., 998 F.2d 157 (3d Cir. 1993); Republic of Philippines v. Westinghouse Elec.

---

[17].  "The right to inspect and copy [judicial records and transcripts] antedates the Constitution."  Criden I, 648 F.2d at 819 (citation omitted).

<u>Corp.</u>, 949 F.2d 653 (3d Cir. 1991). This strong presumption of access to records, including transcripts, provides independent support for the conclusion that the First Amendment right of access must extend equally to transcripts as to live proceedings.

2.

The government next contends that if, indeed, the sealing of the transcripts is to be considered a "closure" which is covered by a right of access, such closure was justified by compelling reasons. Even were that so, we still would be required to reverse the order of the district court. This is because at the time of the sealing, no findings were placed on the record. Findings were not issued until December 9, 1993, nearly five months after the sealing occurred. Under the procedure established in <u>Press-Enterprise I</u> and the subsequent right of access cases, closure may not be retroactively validated. The court here did not satisfy its burden of placing findings on the record which clearly established that closure was necessary to protect an overriding interest. On this basis alone, the order sealing the transcripts was improper.[18] While

[18]. We note as well that this case raises important due process clause issues. First, there was not even minimal notice and an opportunity to respond prior to the deprivation of the right of access. And after the deprivation occurred and the press objected, asserting the right of access, there was a delay before a hearing was afforded. In <u>Raffoul</u>, 826 F.2d at 224, this court held that the due process clause "prohibits exclusion of the press and public from a criminal trial without affording full and fair consideration to the public's interest in maintaining an open proceeding." The court required that motions for closure be publicly docketed, that in camera motions be renewed in open court, and that a brief, pre-closure hearing be granted as a

the district court revisited that order, unsealing the

transcripts with limitations placed upon their use, that initial,

improper action was not cured by the release of the transcript.

See Simone 14 F.3d at 842.  Under Press-Enterprise I, the press

had a right of access to the information, and as each day passed,


(..continued)
matter of right to those actually present in court before closure
may be ordered.  In addition, "interested members of the press
and public must be permitted a hearing within a reasonable time
in order to move for access to sealed transcripts of a closed
proceeding."  Id. at 225.  See also Criden II, 675 F.2d at 559
(requiring that motions for closure of pretrial proceedings must
be entered on docket sufficiently in advance of disposition to
afford an opportunity for intervention and resistance).
        Here, of course, the proceedings were not closed, so
that closure began with the sealing of the transcripts.  Yet that
distinction is not dispositive, for the right of access extends
equally to transcripts as to proceedings.  See supra at __.  The
logic of Raffoul suggests that the provision of some minimal
notice and a limited opportunity for a hearing was incumbent upon
the court before it could impose closure of its own motion.  It
is axiomatic that, at a minimum, procedural due process requires
that the deprivation of a protected interest be accompanied by
notice and an opportunity to be heard at a meaningful time, and
in a meaningful manner.  Goldberg v. Kelly, 397 U.S. 254, 267, 90
S.Ct. 1011, 1020 (1970); Armstrong v. Manzo, 380 U.S. 545, 552,
85 S.Ct. 1187, 1191 (1965); Raffoul, 826 F.2d at 222.  As Justice
Powell observed in Gannett, Co. v. DePasquale, 443 U.S. 368, 400-
01, 99 S.Ct. 2898, 2916 (concurring),

            It is not enough . . . that the trial courts
            apply a certain standard to requests for
            closure.  If the constitutional right of the
            press and public is to have substance,
            representatives of these groups must be given
            an opportunity to be heard on the question of
            their exclusion.

This passage was adopted by a Court majority in Globe Newspaper,
457 U.S. at 609, n. 25, 102 S.Ct. at 2621.

the information denied to the press and the public grew

increasingly stale.

3.

The on-going effect of the initial lack of findings is

a prime example of the correlation between substance and

procedure.  In the First Amendment context, the procedural

requisites to closure are crucial in order to protect against

erroneous restrictions upon the right of access.[19]  Thus, the

requirement that particularized findings of a compelling interest

must be placed on the record before a hearing is closed or a

record sealed is not only for the benefit of the reviewing court

on appeal.  It exists, most fundamentally, to assure careful

analysis by the district court before any limitation is imposed,

because reversal on review cannot fully vindicate First Amendment

rights.

Here, the lack of findings at the outset facilitated

the delay in the unsealing of the transcript.  It is questionable

whether the court's after-the-fact description of its reason for

sealing the transcript pre-verdict--to protect the jury from

outside influences during their deliberations[20]--is supported by

---

[19].  Cf. Mathews v. Eldridge, 424 U.S. 319, 335, 343, 96 S.Ct.
893, 903, 907 (1976)(finding the value of procedural safeguards
to be a factor in determining what procedure is due to protect
against the erroneous deprivation of liberty or property
interests within the meaning of the due process clause).

[20].  Antar, 839 F.Supp. at 300 ("[S]ealing the voir dire was
necessary at that time to preclude any possibility of contact by
the media during deliberations.").

the record.  However, even if it were, that basis evaporated upon the return of a verdict.  By the court's own logic it should have unsealed the transcripts on July 20.  In fact, as early as August 2, the court acknowledged, "I've accomplished my purpose. Absolutely."  Yet the court failed to unseal the documents. Under the First Amendment, once an overriding interest initially necessitating closure has passed, the restrictions must be lifted.[21]  Had the court clearly articulated its reasons for closure on the record, the passing of the purported exigency may have been more noticeable.[22]

The lack of findings also allowed the court to pass over the fact that, where a right of access exists, the proponent of closure bears a strong burden in rebutting the "presumption of

---

[21].  See Capital Cities Media, Inc. v. Toole, 463 U.S. 1303, 1306, 103 S.Ct. 3524, 3527 (1983)(Brennan, Circuit Justice)("Insofar as the State's interest is in shielding jurors from pressure during the course of a trial, so as to ensure the defendant a fair trial, that interest becomes attenuated after the jury brings in its verdict and is discharged."); In re Globe Newspaper Co., 920 F.2d 88, 91 (1st Cir. 1990)("[S]tronger reasons to withhold juror names and addresses will often exist during a trial than after a verdict is rendered.  After the verdict, release normally would seem less likely to harm the rights of the particular accuseds to a fair trial.).

[22].  We indicate no judgment whether the court's post hoc justification, if offered as a finding before closure, would have been sufficiently evidenced to have satisfied the need for an "overriding interest."  In its December 9 opinion the court found that, despite counsel's assurance that he would not release the names and addresses of the jurors to the press before the verdict, the request was sufficient to raise a tangible threat to the purity of the jury's deliberations and sufficiently compelling to have permitted closure.

openness."  Instead of recognizing that it bore the burden of justifying the original sealing order, as well as the decision to maintain the transcripts under seal, the court shifted the burden to the press to demonstrate to the court why the documents should be unsealed.[23]  In effect, once the court accomplished the sealing--without affording either the press or the public the procedural protections of findings, notice, or an opportunity to respond--it viewed the sealed status of the transcripts as the status quo.  From the record before us, the district judge appears not to have recognized that maintaining the transcripts under seal, though a passive act, was an active decision requiring justification under the First Amendment.

Moreover, not only must a court ordering closure establish that an overriding interest compels some limitation upon the right of access, but it must also ensure that the limitation imposed is the least restrictive means possible.  In determining what limitation is least restrictive, the court is justified in recognizing the countervailing need to protect the confidentiality of juror deliberations.  However, threats to that process must be actual and specific, not conclusory and generic. The court must articulate findings of the actual expectation of

_____

[23].  Thus, the court warned that the press would bear "the laboring oar" with regard to any argument in favor of unsealing the transcripts.  In particular, the press would have to establish "what, if any news gathering or First Amendment arguments are sufficient to overcome the very sacred nature of a jury's deliberations" (emphasis added).

an unwarranted intrusion upon juror deliberations or of a probability of harassment of jurors beyond what the jurors, rather than what a particular judge, may deem to be acceptable.

Unfortunately, the district court here failed to make the particularized findings which may sufficiently justify a limitation upon the right of access. This allowed the district judge to rely upon his personal assessment of generalized, societal concerns.

4.

Compounding the problem of the late release of the transcript was the nature of the restrictions, placed upon the press's use of juror information, in the absence of findings that jurors were being harassed or that a threat of undue harassment was impending.[24] As noted above, there is substantial debate about the value of post-verdict interviews. Supra note 8. The benefits of access and of public awareness of the duties and obligations of the jury process are weighed against concerns that courts may become carnivals, that jurors may be reluctant to serve in future cases if they fear their comments in the jury room will be repeated later by their fellow jurors for broadcast to the public, and that public knowledge of the factors behind a verdict may undermine respect for the process.

---

[24]. We deal with the issue here under the circumstance that the restrictions were imposed five months after the conclusion of the trial. We realize of course that the result we reach here might not be appropriate in all aspects were the district court dealing with restrictions on juror contacts at the immediate close of a widely publicized trial.

Though an interesting debate, generalized social claims should not bear upon a decision whether limitations should be placed upon the press's ability to have post-trial access to jurors. Here, for example, the court's concern with harassment was hypothetical, as there was no evidence, or even allegation, of misbehavior by the press.[25] In fact, both in the initial letter to the court requesting the juror's names and at the October 18 hearing, the press suggested that, upon the court's agreement, they would interview those jurors who were willing after the verdict in a separate room at the courthouse, so as to allow the court to supervise and to minimize any potential for disturbing the jurors at their homes. Of course, where evidence of harassment does exist, it is unquestionable that the court has both the power, as well as the duty, to prevent it. In re News-Express Corp., 695 F.2d 807, 810 (5th cir. 1982); United States v. Doherty, 675 F.Supp. 719, 724 (D. Mass. 1987).

Moreover, in the present case, because there is not a sufficient record of the immediacy of juror harassment by the press, we are unable to determine whether there may have been viable alternatives to the limitations imposed on juror contacts after the transcripts were unsealed. The district court was correct to be concerned about the potential negative effect of

_____

[25]. The closest thing to factual support for a finding of a potential for harassment is the court's observation of what it called a "truism"-- that "reporters are persistent and tenacious in pursuing information." 839 F.Supp. at 303 (citation omitted).

disclosures by former jurors upon the freedom and candor of deliberations in future cases. And though this may not suffice to restrict the right of access to voir dire transcripts, it does not mean that other avenues of recourse are unavailable. In particular, the district court has the discretion to discuss press contacts with the jury at the end of a trial; to emphasize to the jurors the importance of maintaining the confidentiality of jury deliberations in order to promote frank discussion during those deliberations; to assure jurors that the court will protect them from harassment by the press; to provide, if necessary, a neutral area where the press can interview the jurors; and to remind the jurors of the value of their service and the crucial role that trust and confidentiality among jurors plays in the fulfillment of their duty. See, e.g., Globe Newspaper, 920 F.2d at 93-94 ("It has . . . been a common and, we believe, wise custom for trial judges to advise jurors . . . that they not only are free to refuse to disclose what went on in the jury room, but that they may well think it better and more prudent to decline to discuss what occurred."). Such comments from the bench, though cautionary in nature, are thoughtfully received by jurors who generally accept their role with the seriousness it is due.

Turning to the specific restrictions imposed here, we will affirm the first, that no juror is obliged, or may be compelled, to grant an interview. This restriction is consistent with the advice long given to jurors concerning post-trial press

contacts. We conclude, however, that the second and third prohibitions, against "repeated" juror contacts and against any attempt to resume a juror interview after a juror expresses a desire to conclude it, cannot stand in the absence of any finding by the court that harassing or intrusive interviews are occurring or are intended. The existing or threatened basis for such restrictions must be present before they are imposed. Furthermore, even if sufficient basis for imposing these restrictions did exist, it is not certain that, in the absence of the consideration of alternatives, they would have been the least restrictive means available to the court.

The fourth prohibition, forbidding inquiry into the "specific votes, statements, opinions or other comments" of any other juror, encompasses in part the provision in the Handbook for Trial Jurors, "the court may enter an order in a specific case that during any such [post-trial] interview, jurors may not give any information with respect to the vote of any other juror." Handbook at 11 (emphasis added). The Handbook provision is directed at "specific" cases, not all cases. We cannot ascertain after the fact whether the fourth restriction, in its broader form, was necessary one year ago under the circumstances of this specific case. We will not vacate it because such a restriction is appropriate in certain specific cases. We are troubled, however, by the lack of explanation for its imposition here. When in a specific future case the district court may

determine to impose a similar restriction, our appellate review would be assisted if the district court were to give an explanation for the necessity of the restriction.

IV.

In closing, we acknowledge the weight of the district court's concerns. However, we conclude that restrictions on post-trial interviews must reflect an impending threat of jury harassment rather than a generalized misgiving about the wisdom of such interviews. For the foregoing reasons, the order of the district court will be reversed as to the original sealing order and as to that part of the unsealing order which comprises the second and third restrictions on juror contacts by the press. We will affirm the district court's imposition of the first and fourth restrictions.

RE:  UNITED STATES v. EDDIE ANTAR, et al.
     Nos. 93-5732, 93-5733, 94-5006

_____

ROSENN, Circuit Judge, concurring.

        This case marks another effort by the press to test the
outer limits of their right to gather and print news about all
aspects of the judicial system and implicates the historic
efforts of the courts to protect the confidentiality of a jury's
deliberative process.  Our decision today recognizes the right of
press access to the courts, including the right to interview
jurors, but we reaffirm that this right is not absolute.  The
press' right to interview jurors is separated by a delicate but
important line between the permissible and the impermissible.  We
attempt to draw that line in this case.

        I write separately, however, to express my deep concern
that the court, by its opinion, may be announcing conflicting and
confusing standards with respect to the findings a district court
must make before invoking closure during a criminal trial.
Moreover, the court's opinion unnecessarily requires post-trial
factual findings before a trial court can attempt to guide the
press and jurors over the dangerous shoals that must be carefully
navigated whenever jurors are interviewed after a verdict.

                                A.

        In this modern era, federal trial courts are confronted
with increasingly complex cases in both civil and criminal

trials.  The trials are often complicated by intricate procedural rules, lengthy discovery, and time-consuming collateral issues. In a lengthy, nationally covered, high-profile criminal proceeding, such as this case, the trial judge's attempts to control and protect the integrity of the judicial process are challenging and fraught with deep risks.  An appellate court, therefore, should refrain from burdening the trial court with unnecessary and exacting findings regarding collateral matters.

The court commences its opinion with a standard that requires specific findings before a trial court may order closure so that a reviewing court can determine whether the trial court properly entered a closure order.  The Supreme Court of the United States announced this standard in 1984 and this court followed it until today.  Now, however, the court expands the standard by requiring the judge to make "detailed" (Maj. Op. at 5) and "individualized" (Maj. Op. at 27) findings before effecting closure.  More troubling is the requirement that the findings "clearly" establish that the closure was necessary to protect an overriding interest.  (Maj. Op. at 32).

I see no difference between the specificity of findings necessary to determine whether closure is justified and the findings required in any other dispositive aspect of a judicial proceeding.  Trial court findings must be sufficient to enable a reviewing court to ascertain the basis and validity of the trial court's questioned ruling.  No greater purpose or burden attaches

to findings because they are made in a proceeding involving First Amendment issues. This is demonstrated in Press-Enterprise Co. v. Superior Court of California, 464 U.S. 501 (1984), (Press-Enterprise I) where the Court discussed the quality of the findings necessary to overcome the presumption of openness and justify closure. The Court stated that the threatened interest must be articulated with findings "specific enough that a reviewing court can determine whether the closure was properly ordered." Id. at 510. The Court reiterated that standard two years later in Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 13 (1986) (Press-Enterprise II). The Court required no more.

One year later, the press complained in United States v. Raffoul, 826 F.2d 218 (3d Cir. 1987), that the district court did not articulate reasons for closure with sufficient specificity. Citing Press Enterprise I, this court adhered to the standard of specific findings enunciated in that case. More recently in United States v. Simone, 14 F.3d 833, 840 (3d Cir. 1994), this court determined that a party's First Amendment right of access applied to post-trial examination of jurors for potential misconduct. We therefore considered the sufficiency of the district court's findings to justify restriction of that right. Again, the court relied on the specific findings standard referred to in Press Enterprise I. I see no reason in this case to depart from the standard we followed in Raffoul and Simone. Nothing here justifies a higher, more burdensome standard. Yet,

the court's opinion today enhances the specific findings standard. By requiring that the trial court's findings "clearly" establish that closure was necessary to protect an overriding interest, the court puts us uncomfortably close to the clear and convincing standard of proof required to establish fraud. The additional findings now required can only lead to troublesome problems by requiring a trial court to calibrate its findings.

B.

With respect to the sensitive area of post-verdict interrogation of jurors, the trial court was justifiably concerned with the unsupervised behavior of a zealous and aggressive press in these "high-profile prosecutions for securities fraud, RICO conspiracy, mail fraud, and related charges." The courts traditionally have worried about protecting the secrecy of a jury's deliberations because of the substantial danger of embarrassing, harassing, or intimidating a juror. This case took approximately seven weeks to try and required more than six days of jury deliberations. Understandably, the trial judge was gravely concerned with preserving the integrity of the trial proceedings, the confidentiality of the jury's deliberations and the thought processes of the individual jurors.

Under these circumstances, the trial court ultimately ordered the unsealing of the voir dire transcripts and the judge imposed certain limitations regarding the manner in which post-verdict interviews were to be conducted in order to protect the

jurors' privacy and in the interest of maintaining the secrecy of
the jury deliberative process.  The judge wrote each of the
former jurors a letter informing them of his unsealing order and
the consequent disclosure of the jurors' names and hometowns.
The court informed them that they might be contacted by the media
and explained their role in the justice system and the tradition
of secrecy accorded jury deliberations.  The judge was obviously
motivated by the long recognized view of the courts that "freedom
of deliberative thought is central to the institution of trial by
jury and that this freedom is endangered almost as seriously by
the prospect of post-trial disclosure as it is by the presence of
spectators in the jury room."  Note, 96 Harv. L. Rev. 905 (1982-
83).

The trial judge further advised the jurors that in
issuing his order unsealing the public record, he had included
the following guidelines to be followed by anyone seeking a juror
interview:

> (a)  no juror is under any obligation to
> grant an interview nor may any juror be
> compelled to do so;

> (b)  repeated requests of a juror for an
> interview by any person or any associate of
> that person are strictly prohibited;

> (c)  once a juror expresses a desire to
> conclude an interview already in progress,
> the interviewer must immediately cease all
> questioning;

> (d)  although . . . free to discuss any
> aspect of the case, [a juror] should be aware
> that no one may ask about the specific vote,

> statement, opinion, thoughts or comments of
> any juror other than [him/herself].

As the court notes today, the first limitation is consistent with "the routine instructions" customarily given to jurors in the federal system. As an "instruction" or guideline, no findings are required before it is given. The court also notes that the fourth limitation directed to maintaining the confidentiality of the jury deliberations is, like the first, consistent with the provisions of the federal Handbook for Trial Jurors. The Handbook instructs the jurors that "the court may enter an order in a specific case that during any [post-verdict] interview, jurors may not give any information with respect to the vote of any other juror." Again, the Handbook does not require the district court to make any findings before it gives this instruction. In fact, the judge acknowledged the limited effect of this instruction when, during discussion of the contents of his proposed letter to the jurors, he informed counsel that "[i]f a juror freely chooses to disclose such information, so be it." United States v. Antar, 839 F. Supp. 283, 305 (D. N.J. 1993).

In its second and third instructions, the court may have been excessively cautious in its effort to protect the jurors from harassment, embarrassment, or intimidation. The problem with the second instruction is that more than one or two requests may be made of a juror, depending upon the nuance, tone, and language of the interviewer, without harassing the juror.

This instruction also disregards the possibility that each juror may have a different tolerance for harassment. Therefore, the language of this instruction is arbitrary and inflexible.

The third instruction does not allow for a situation where a juror may express a desire which is tentative or indecisive. This instruction does not give an interviewer a reasonable amount of latitude. Had the court limited its instructions to forbidding the interviewers from harassing, embarrassing, or intimidating a juror, the instructions would have been consistent with the concerns expressed by the Supreme Court and reflected in Federal Rule of Evidence 606(b). However, the instructions actually given here unduly limited the perimeters of a reasonably permissible interview.

In United States v. Moten, 582 F.2d 654 (2d Cir. 1978), the court of appeals considered an application for permission to conduct post-verdict juror interviews. The court observed that "the proper functioning of the jury system requires that the court protect jurors from being 'harassed and beset by the defeated party in an effort to secure from them evidence . . . to set aside the verdict.'" Id. at 664 (citing McDonald v. Pless, 238 U.S. 264, 267 (1915)). In addition, the court recognized that certain limits on post-trial inquiry into jury verdicts are necessary in the interest of finality. Id. There is also a danger, noted in Moten, that some jurors instead of feeling harassed, might revel in the attention of a post-trial interview,

especially if interviewed by the national press or media, and disclose secrets or express misgivings, lingering doubts, or even complaints about fellow jurors.  This might lead jurors to "imagin[e] sinister happenings which simply did not occur or [to] say[] things which . . . would serve only to decrease public confidence in verdicts."  Id. at 665.  The court, therefore, concluded that supervision of interviews is desirable, not only to protect jurors from harassment, but also to insure that the inquiry does not range beyond subjects permissible for juror testimony under Fed. R. Evid. 606(b).

The notes of the Advisory Committee with respect to Fed. R. Evid. 606(b) support the district court's concern in this case.

> The mental operations and emotional reactions of the jurors in arriving at a given result would, if allowed as a subject of inquiry, place every verdict at the mercy of jurors and invite tampering and harassment.

> * * * * *

> Under the federal decisions the central focus has been upon insulation of the manner in which the jury reached its verdict, and this protection extends to each of the components of deliberation, including arguments, statements, discussions, mental and emotional reactions, votes, and any other feature of the process.

28 U.S.C.A. § 606(b).

I agree that the second and third instructions are an overstatement of the law which could unduly hamper a journalist

in an appropriate interview.  I reach this conclusion, not because there is an "absence of any finding by the court that harassing or intrusive interviews are occurring," (Maj. Op. at 39) but because the limitations imposed by the court had the effect of forbidding permissible inquiries that may not reach the point of harassment, embarrassment, or intimidation.  In giving instructions on unsupervised interviews of jurors, findings are not only unnecessary and burdensome, but potentially impossible because the interviews will be conducted in the future.  We must bear in mind that the confidentiality of the thought processes of jurors, their privileged exchange of views, and the freedom to be candid in their deliberations are the soul of the jury system. This interaction must be zealously guarded from any impermissible encroachment if the system is to survive.  If there is any material error of law in a court's instruction to the jurors, the injured party may obtain relief from the appellate court, as it did here.

Because I agree that the court erred in issuing instructions 2 and 3, I concur.